Russell T. BRENNER and Donna Brenner,
Plaintiffs-Respondents,

v.

NATIONAL CASUALTY COMPANY and Milwaukee World
Festival, Inc., Defendants-Appellants,†

AMERISURE MUTUAL INSURANCE COMPANY, Garland
Brothers Joint Venture and Garland Brothers,
Inc., Defendants,

CHARTER MANUFACTURING Co. and Ace American
Insurance Company, Defendants-Respondents.

Court of Appeals

*No. 2014AP2376. Submitted on briefs August 3, 2015.
—Decided October 6, 2015.*

2015 WI App 85

(Also reported in 872 N.W.2d 124.)

† Petition for Review Granted.

476

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Pamela M. Schmidt* of *Scopelitis, Garvin, Light, Hanson & Feary*, Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Timothy S. Trecek* of *Habush Habush & Rottier, S.C.*, Milwaukee.

Before Kessler, Brennan and Bradley, JJ.

¶ 1. BRENNAN, J. Russell T. Brenner, while working for Hunzinger Construction, fell through a large hole in the floor of a building owned by Milwaukee World Festival, Inc. The accident happened while Brenner was moving a large plywood panel covering the hole. Brenner was severely injured.

¶ 2. Brenner and his wife filed suit, alleging negligence and safe-place statute claims against: (1) Milwaukee World Festival, Inc., as the owner of the building at the time of Brenner's fall, and its insurer National Casualty Company, (collectively "MWF"); (2) Garland Brothers Joint Venture, as the former owner of the building; Garland Brothers, Inc., as an agent of Garland Brothers Joint Venture; and

479

their insurer Amerisure Mutual Insurance Company, (collectively "Garland Brothers"); and (3) Charter Manufacturing Co., as the former long-term tenant of the building, and its insurer Ace American Insurance Co., (collectively "Charter").

¶ 3. Following motions for summary judgment, the circuit court dismissed the Brenners' negligence claim against Charter and Garland Brothers on the grounds that it was barred by the doctrine of *caveat emptor*, or "buyer beware," in Restatement (Second) of Torts § 352. The circuit court reasoned that because Charter had already relinquished possession of the premises before MWF purchased the property and before Brenner was injured, § 352 applied to shift liability from Charter to the buyer, MWF. MWF appeals Charter's dismissal from the lawsuit.[1]

¶ 4. MWF argues that: (1) Charter, as a former long-term tenant, is not a "vendor" under Restatement (Second) of Torts § 352; therefore, § 352 does not act to shield Charter from liability; and (2) even if Charter qualifies as a vendor under § 352, Restatement (Second) of Torts § 353 sets forth an exception reinstating Charter's exposure to liability. We disagree.

---

[1] Brenner executed *Pierringer* releases in favor of the dismissed parties in exchange for waiver of costs. "[A] *Pierringer* release, in effect, limits a second joint tort-feasor's liability to the amount reflecting its proportion of wrongdoing. Stated differently, a *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants." *VanCleve v. City of Marinette*, 2003 WI 2, ¶ 39, 258 Wis. 2d 80, 655 N.W.2d 113 (footnote and internal citations omitted); *see also Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

¶ 5. In sum, we conclude, as did the circuit court, that Charter, the former tenant, is entitled to protection as a "vendor" under RESTATEMENT (SECOND) OF TORTS § 352 because the rationale behind § 352, as well as the caselaw, extends the protection from liability to the one who has relinquished possession of the property to the buyer. Here, Charter relinquished possession of the building to Garland Brothers in November 2009, one and one-half years before MWF bought it "As-Is" in May 2011. Charter neither had possession nor the right to possession of the building at the time it was sold to MWF or when Brenner was injured. Furthermore, we conclude that RESTATEMENT (SECOND) OF TORTS § 353 does not apply in this instance to impose liability on Charter because the undisputed facts do not show that MWF did not know or have reason to know of the danger the plywood panels posed. As such, we affirm.

## BACKGROUND

¶ 6. This case comes to us on motion for summary judgment; the facts necessary for resolution of the issues raised by MWF are not materially disputed and are set forth herein.

¶ 7. For approximately twenty-one and a half years, Garland Brothers owned the building at the heart of this lawsuit, located in the City of Milwaukee. For over twenty of those years, Charter leased the building under a triple-net lease, pursuant to which Charter had the exclusive right to possession and the obligation to maintain and repair the building. Charter used the property as a factory to manufacture wire, installing a row of machinery on the metal grate floor, and as office space. During 2009, Charter notified Garland Brothers of its intent to terminate its tenancy.

¶ 8. Pursuant to its lease with Garland Brothers, Charter was obligated to remove its machinery when it vacated the premises; the machinery included large heat treat furnaces that extended through the metal grate floor into a pit below. Charter retained Pieper Electric to perform certain work required by vacation of the property; Pieper subcontracted the removal of the heat treat furnaces and the covering of the resultant holes to Harrison Metals.

¶ 9. Harrison Metals created plywood boxes or panels consisting of a flat cover with sides. Harrison made several panels to cover several holes. The panels covering the holes in the floor were not marked or tethered to indicate that they covered large holes in the floor. Although the holes were not visible to persons on the main floor when the covers were in place, the wood panels were in plain view and there was a stairway to a clearly visible lower level immediately next to the holes. The undersides of the covered holes were in plain view from the stairs.

¶ 10. An agent of Garland Brothers, Garland Brothers, Inc. ("GBI"), assumed responsibility for negotiating the termination of Charter's lease. As part of the negotiations, GBI retained a consultant to inspect the building before Charter vacated it. Before surrendering the premises, Charter was asked to "[f]ill in the pit on the north[west] corner of the building," that is, the pit immediately below the holes in the floor where the heat treat furnaces had been removed. Charter refused and in November 2009 was permitted to surrender the property, without filling the pit, so long as it was left in a "clean and safe condition."

¶ 11. On December 31, 2009, GBI did a final walkthrough of the property with its experts and Charter representatives. GBI had an opportunity to

inspect the premises with experts it retained and on whom it relied to determine whether Charter had met its obligations with respect to putting the pits in a "clean and safe condition." GBI did not raise any more concerns about the pit.

¶ 12. After Charter vacated the building, Garland Brothers sold it to MWF in " 'as-is, where-is' condition" and " 'with all faults.' " MWF took possession of the property in May 2011. When MWF bought the property, it intended to demolish the building and create additional parking. The condition of the building was, therefore, largely immaterial to MWF at the time of purchase. Later, after the sale was completed, MWF decided to retain part of the property for storage and auxiliary office space.

¶ 13. MWF's General Counsel Frank Nicotera testified that MWF understood that the contract has "as is, where is" language, "similar to the known statement of buyer beware." Nicotera agreed that MWF had time to inspect and familiarize itself with the property prior to purchase. Nicotera admitted that he personally, on behalf of MWF, walked through the property while Charter still occupied the premises. Nicotera recalled seeing the machinery "coming out of—underneath that vented floor."

¶ 14. MWF performed numerous inspections and walk throughs of the premises prior to purchase. For example:

- MWF's designer, Jason Stuewe, inspected the building on MWF's initial tour, then entered a second time to investigate the feasibility of making an entryway in the area where Brenner ultimately fell.
- Robert Gosse, MWF's Director of Design and Construction, testified that MWF had secured a

key, allowing him to frequently enter the building, pre-purchase, for planning purposes.

- MWF personnel inspected the premises when the roof in the adjoining building collapsed in February 2011.
- During the due diligence period, Nicotera hired Sigma Environmental Services, Inc. ("Sigma"), to perform a Phase I environmental review. On January 14, 2011, Sigma sent MWF a report that discussed two "collection pits" on the site and included photographs of the "manufacturing area," showing a panel on the floor and a "covered pit." The photograph shows that the floor panel was neither labeled nor tethered.
- MWF also engaged Giles Engineering Associates, Inc. ("Giles") to perform Phase II environmental review and testing. Giles sent MWF a report that disclosed the existence of the covered pits under the hole where Brenner fell. Giles conducted environmental testing at the subject pit.

¶ 15. After the purchase of the building, MWF hired Hunzinger to perform renovations. While working on the renovation project, Hunzinger workers moved other plywood panels in the building; however, those plywood panels were not covering large floor openings. On the day of the accident, Brenner along with two of his co-workers moved one of the plywood panels covering a hole left by Charter's removal of the heat treat furnaces. While moving the panel, Brenner fell through the hole into the pit and sustained injuries.

¶ 16. The Brenners filed suit against Charter, Garland Brothers, MWF, and their respective insurers, asserting negligence and safe-place statute claims. Garland Brothers and Charter filed motions for summary judgment on the grounds that they could not be liable for Brenner's injuries due to their relinquishment of the premises well before he was injured. Despite the Brenners and MWF opposing the motions, the circuit court granted the motions for summary judgment. As relevant here, the court found that RESTATEMENT (SECOND) OF TORTS § 352 acted to bar the Brenners' negligence claim against Charter. MWF appeals the dismissal of Charter and its insurer.[2]

## STANDARD OF REVIEW

¶ 17. This case comes to us following the circuit court's decision granting Charter summary judgment. We review a grant of summary judgment independently of the circuit court, but benefitting from its analysis. *See Blasing v. Zurich Am. Ins. Co.*, 2014 WI 73, ¶ 89, 356 Wis. 2d 63, 850 N.W.2d 138. We apply the same standards used by the circuit court, as set forth in WIS. STAT. § 802.08 (2013–14). *Krier v. Vilione*, 2009 WI 45, ¶ 14, 317 Wis. 2d 288, 766 N.W.2d 517. First, we must determine if the pleadings state a claim. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). If the plaintiff has stated a claim and the pleadings show the existence of factual issues, then we must examine whether the party moving for summary judgment has presented a de-

---

[2] MWF does not challenge the circuit court's dismissal of Garland Brothers or the safe-place statute claim against Charter.

fense that would defeat the claim. *See Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 22, 241 Wis. 2d 804, 623 N.W.2d 751. If the moving party has made a prima facie case, the court examines the pleadings, affidavits, depositions, or other proof of the opposing party to determine whether disputed material facts exist, or whether reasonable conflicting inferences may be drawn from undisputed facts, therefore requiring a trial. *See id.* Evidentiary facts, as set forth in the affidavits or other proof of the moving party, are taken as true if not contradicted by opposing affidavits or other proofs. *L.L.N. v. Clauder*, 209 Wis. 2d 674, 684, 563 N.W.2d 434 (1997).

## DISCUSSION

¶ 18. MWF challenges the circuit court's decision to dismiss the Brenners' negligence claim against Charter on the grounds that: (1) RESTATEMENT (SECOND) OF TORTS § 352 does not apply; and (2) even if § 352 does apply, the circuit court erred in concluding that RESTATEMENT (SECOND) OF TORTS § 353 does not supersede § 352 to hold open the possibility of Charter's liability on negligence grounds. For the reasons which follow, we affirm.

¶ 19. There are four elements to any negligence claim: (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the breach and the plaintiff's injury; and (4) actual loss or damage resulting from the injury. *Gritzner v. Michael R.*, 2000 WI 68, ¶¶ 19–20, 235 Wis. 2d 781, 611 N.W.2d 906. For purposes of summary judgment, the parties only addressed whether Charter owed Brenner a duty of care.

486

¶ 20. In Wisconsin, the general rule is that everyone owes a duty to everyone else. *Behrendt v. Gulf Underwriters Ins. Co.*, 2009 WI 71, ¶ 17, 318 Wis. 2d 622, 768 N.W.2d 568. However, Wisconsin applies an exception to that general rule—*caveat emptor* or "buyer beware"—as embodied in RESTATEMENT (SECOND) OF TORTS § 352, which states:

> Except as stated in [RESTATEMENT (SECOND) OF TORTS] § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

*Id.*; *see also Bagnowski v. Preway, Inc.*, 138 Wis. 2d 241, 405 N.W.2d 746 (Ct. App. 1987); *McCarty v. Covelli*, 182 Wis. 2d 342, 514 N.W.2d 45 (Ct. App. 1994). MWF argues that § 352 does not apply here because Charter, as the former tenant, is not a vendor.

¶ 21. MWF goes on to argue that even if Charter is a vendor pursuant to RESTATEMENT (SECOND) OF TORTS § 352, the circuit court erred in concluding that RESTATEMENT (SECOND) OF TORTS § 353 does not apply to impose liability on Charter. Section 353 provides an exception to § 352, eliminating immunity from liability for:

> (1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

*See* § 353. MWF argues that § 353 applies because the undisputed material facts show: (1) that Charter knew or should have known that the unmarked and untethered plywood panels covering the holes created a dangerous condition; (2) that MWF did not know and had no reason to know of the dangerous condition; and (3) that Charter knew or should have known that MWF did not know of the dangerous condition.

¶ 22. We address each of MWF's concerns in turn.

*I. Charter qualifies as a "vendor" under* RESTATEMENT *(*SECOND*) OF* TORTS *§ 352.*

¶ 23. MWF first contends that the circuit court erred in applying RESTATEMENT (SECOND) OF TORTS § 352 because MWF does not believe that Charter qualifies as a "vendor." MWF argues that when the circuit court found that Charter qualified as a vendor under § 352, it erroneously relied on *Great Atlantic & Pacific Tea Co. v. Wilson*, 408 N.E.2d 144 (Ind. Ct. App. 1980), and *Brock v. Rogers & Babler, Inc.*, 536 P.2d 778 (Alaska 1975).

¶ 24. Because there are no Wisconsin cases on whether a former tenant qualifies as a vendor under RESTATEMENT (SECOND) OF TORTS § 352, the circuit court

properly turned to other jurisdictions. Both *Brock* and *Great Atlantic*, advise that Charter qualifies as a vendor.

¶ 25. In *Brock*, three years after the lessee vacated the property, the plaintiff nearly drowned in an artificial lake on the property. *Id.*, 536 P.2d at 780–81. Considering whether RESTATEMENT (SECOND) OF TORTS § 352 protected the former lessee from liability, the Alaska Supreme Court concluded that the former lessee was protected because the rationale behind the doctrine was "to limit liability to persons in possession and control of the land." The court said:

> While [§ 352] refers to vendors of land, it is broad enough to cover a former lessee who had relinquished his possessory interest in the premises. The rationale is grounded in a general policy which seeks to limit liability to persons in possession and control of the land. *One who lacks possession and control of property normally should not be held liable for injuries which he is no longer in a position to prevent. This principle applies with equal force to previous tenants, as well as to past owners of property.*

*Id.* at 782 (footnotes omitted; emphasis added).

¶ 26. In *Great Atlantic*, the Indiana Court of Appeals considered a fact pattern similar to the one before us. The property owner constructed a building for Great Atlantic to lease, with a hole in the floor for a conveyor system. *Id.*, 408 N.E.2d at 146. When the lease ended, Great Atlantic removed its equipment, leaving the hole open, and returned control of the property to the owner. *Id.* The plaintiff fell into the hole and sued. *Id.* Relying in part on RESTATEMENT (SECOND) OF TORTS § 352, as interpreted by *Brock, see id.* at 147, the court dismissed the claims against Great Atlantic, explaining: "liability for injury ordinarily

489

depends upon the power to prevent injury and, therefore, rests upon the person who has control and possession through ownership, lease, or otherwise." *Id.* at 148. The court also noted: "The liability of a lessee surrendering possession certainly could not exceed that of a vendor or lessor, and since a lessee has never had more than a limited interest in the property, it could be said that the residual liability would be less." *Id.* at 150.

¶ 27. These principles accord with Wisconsin's application of RESTATEMENT (SECOND) OF TORTS § 352. Although not directly on point, *McCarty* is instructive. In *McCarty*, we held that the vendee's *right* to possession of the property was sufficient to impose liability on the vendee—even if the vendee was not yet in *actual* possession and in the process of moving in when the injury occurred. *Id.*, 182 Wis. 2d at 346. Thus, we acknowledged, as *Brock* and *Great Atlantic* did, that the "right of possession" is the touchstone of liability. *See McCarty*, 182 Wis. 2d at 346 (stating that § 352 "requires that the vendee be in possession" and "that the test is not whether the vendee is actually in possession, but rather whether the vendee has the right of possession"). Here, as the former tenant of the property, Charter "lack[ed] possession and control of property" at the time of the accident; MWF, the vendee, was in actual possession, and thus Charter "should not be held liable for injuries which [it was] no longer in a position to prevent." *See Brock*, 536 P.2d at 782.

¶ 28. In so holding, we reject MWF's reliance on *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 288 N.W.2d 95 (1980). To be sure, *Ollerman* states that Wisconsin "has moved away from the rule of caveat emptor in real estate transactions." *See id.* at 38. However, it does so in a completely different context from the case here.

The narrow issue in *Ollerman* was whether the complaint sufficiently stated an intentional misrepresentation claim in a real estate transaction between a subdivider-vendor of a residential lot and a noncommercial purchaser. It involved a far different set of facts. Most significantly, it did not involve RESTATEMENT (SECOND) OF TORTS §§ 352 or 353. Furthermore, *Ollerman* was decided in 1980, and we have endorsed application of § 352 in real estate transactions since then. *See Bagnowski*, 138 Wis. 2d 241 (decided in 1987); *McCarty*, 182 Wis. 2d 342 (decided in 1994). Thus, *caveat emptor* is still alive in Wisconsin.

¶ 29. Consequently, we conclude as a matter of law that Charter, as a former tenant, qualifies as a vendor under § 352, and that the circuit court did not err in concluding the same.

*II. The undisputed facts show that the exception to RESTATEMENT (SECOND) OF TORTS § 352, set forth in RESTATEMENT (SECOND) OF TORTS § 353, does not apply.*

¶ 30. In the alternative, MWF argues that even if Charter is a vendor under RESTATEMENT (SECOND) OF TORTS § 352, the circuit court erred in concluding that RESTATEMENT (SECOND) OF TORTS § 353 does not apply to expose Charter to liability. We disagree.

¶ 31. RESTATEMENT (SECOND) OF TORTS § 353 creates an exception to RESTATEMENT (SECOND) OF TORTS § 352, and holds a vendor liable, even after a change in possession, when: (1) the vendor knows or has reason to know of a hazard; (2) the vendee does not know or have reason to know of the hazard; and (3) the vendor has reason to believe that the vendee will not discover

the hazard. *See* § 353. The circuit court, in a thoughtful and well-articulated decision, ruled as follows:

> I have concluded that neither the Brenners nor MWF can make all three of these showings in this case, therefore, the exception to seller immunity in Section 353 of the Restatement (Second) doesn't come into play in this case.
>
> . . . . [T]rying to satisfy all three of the elements of Section 353 leaves the Brenners and MWF in a bit of a dilemma.
>
> The dilemma arises from the lack of direct evidence that any of the defendants, or for that matter any party, that any party has about whether the defendants were or were not aware of the deceptive benignity of that plywood cover. There is no direct evidence that any of the defendants were so aware.
>
> There is no evidence, for example, that some agent or employee of one of the defendants remarked about the cover and the fact that it wasn't marked or tethered, or that someone could be fooled into believing there wasn't a gaping hole under it, or that somebody might try to move it and then fall into the hole, or that there's plywood laying all around, how are they going to know why this plywood is so important?
>
> No, the only way the Brenners or MWF can prove this point is indirectly. Each of them suggests that the seller's awareness of the hazard can be inferred. It can be inferred from the fact that each was in a position to inspect the premises and to know what was under the covers, and therefore, each could plainly see that the covers weren't marked or tethered.
>
> In other words, the Brenners and MWF would argue, the seller's knowledge of the hazard can be inferred from the seller's control over the premises, and the seller's opportunity to inspect the premises

and see the hazard in the first place. Well, here's the dilemma for MWF and Mr. Brenner.

> To the extent that such an inference is reasonable, to the extent that such an inference will have any persuasive power before a jury, to the extent that such an inference will latch on to [Garland Brothers] or GBI or Charter or all three of them, well, that very same inference can be drawn against MWF, because MWF had pretty much the same opportunity to . . . inspect the premises and discover the hazard, pretty much the same opportunity that [Garland Brothers] and GBI and Charter had.

> If this is true, then neither the Brenners nor MWF can satisfy both the first and second element of Section 353, that is, that the seller was aware of the hazard or should have been aware of the hazard, and that the buyer in this case, MWF, was not aware of the hazard and did not have a reason to know of the hazard.

We absolutely agree.

¶ 32. MWF argues that the circuit court's finding is in error because "[w]hile there is evidence that MWF knew of the pit, there is no evidence MWF knew that holes had been cut in the floor above the pit and concealed with plywood." However, even if we accept that statement as true, that does not end our inquiry. In order for RESTATEMENT (SECOND) OF TORTS § 353 to apply, MWF must also show that it did not have *reason* to know of the holes that had been cut in the floor above the pit or that the plywood coverings hid the hazard. Based on the record, MWF cannot make that showing.

¶ 33. To begin, it is undisputed that removal of the heat treat furnaces left several large holes in the metal grate floor and that there was a stairway immediately adjacent to the holes indicating that there was

empty space underneath the floor. It is further undisputed that, while the holes themselves could not be seen while standing on the metal grate floor because they were covered with the plywood panels, the holes were clearly visible from the staircase and from the pits beneath when looking up. Photographs in the record show that the plywood boxes or panels had sides on them and they were open and obvious to anyone passing by, although they were unmarked and untethered and did not otherwise indicate that they were covering large holes in the floor. The panels clearly provided a *reason* to know that they covered something that required caution.

¶ 34. At the time MWF purchased the building, it knew it was obtaining the building "as-is, where-is" and there is overwhelming evidence in the record that MWF thoroughly inspected the building prior to and after purchase:

- Nicotera, MWF's general counsel, testified that MWF had ample time to inspect the building while Charter still occupied the premises.
- Nicotera recalled personally walking through the property on MWF's behalf prior to purchase and saw the heat treat furnaces "coming out of" the metal grate floor.
- Stuewe, an MWF designer, inspected the building to investigate the feasibility of making an entry way in the corner where Brenner fell.
- Gosse, MWF's Director of Design and Construction, testified that he had a key and frequently entered the building for planning purposes.
- MWF personnel inspected the premises when the roof of the adjoining building collapsed.

- Sigma, an expert hired by MWF, performed an environmental review of the building and specifically noted the existence of the pits directly under the holes and provided photos of the plywood panels with sides.
- Giles, a second expert hired by MWF, also performed an environmental review of the building and conducted tests on the pits directly under the holes.
- Snow, MWF Director of Facility and Event Operations, and other staff toured the building and within weeks of purchase began storing items in it, including in the corner where Brenner fell.

¶ 35. It is simply illogical to conclude, given the numerous MWF representatives who toured and inspected the building, that MWF did not know that the plywood panels on the floor, which were obviously unmarked and untethered, covered large holes in the floor that led to a pit below. While MWF claims there is no evidence that it actually *did* know of the holes cut in the floor above the pit, the record shows that, at the very least, it *had reason to know.* As such, the circuit court properly concluded that RESTATEMENT (SECOND) OF TORTS § 353 does not apply.

¶ 36. In sum, the undisputed material facts show that both MWF and Charter had reason to know that: (1) there were large holes in the metal grate floor that led to a pit; (2) the holes were covered by large plywood panels; and (3) the panels were unmarked and untethered and did not otherwise indicate that they hid the large holes. To the extent that those facts should have notified Charter of a dangerous condition, they also should have notified MWF of the same. Unfortunately for MWF, Wisconsin law holds

495

only the entity in possession and control of the property liable, as the entity in possession and control is the only entity in a position to prevent the accident.

*By the Court.*—Order affirmed.