# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2376 |
| COMPLETE TITLE: | Donna Brenner, as Personal Representative for the Estate of Russell T. Brenner and Donna Brenner, Individually, |
| | Plaintiffs-Respondents, |
| | v. |
| | Amerisure Mutual Insurance Company, Garland Brothers Joint Venture and Garland Brothers, Inc., |
| | Defendants, |
| | Charter Manufacturing Co. and Ace American Insurance Company, |
| | Defendants-Respondents, |
| | National Casualty Company and Milwaukee World Festival, Inc., |
| | Defendants-Appellants-Petitioners. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at: 365 Wis. 2d 476, 872 N.W.2d 124
(2015 WI App 85 – Published)

| | |
|---|---|
| OPINION FILED: | April 18, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 26, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Richard J. Sankovitz |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | BRADLEY, R.G., J. did not participate. |

ATTORNEYS:

For the defendants-appellants-petitioners, there were briefs by *Pamela M. Schmidt* and *Scopelitis, Garvin, Light, Hanson & Feary, P.C.*, Milwaukee, and oral argument by Pamela M. Schmidt.

For the plaintiffs-respondents, there was a brief by *Susan R. Tyndall, Timothy S. Trecek* and *Habush Habush & Rottier, S.C.*, Milwaukee, and oral argument by Susan R. Tyndall.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2014AP2376
(L.C. No.  2012CV12446)

STATE OF WISCONSIN            :        IN SUPREME COURT

Donna Brenner, as Personal Representative for the Estate of Russell T. Brenner and Donna Brenner, Individually,

Plaintiffs-Respondents,

v.

Amerisure Mutual Insurance Company, Garland Brothers Joint Venture and Garland Brothers, Inc.,

Defendants,

Charter Manufacturing Co. and Ace American Insurance

Company,

Defendants-Respondents,

National Casualty Company and Milwaukee World Festival,

Inc.,

Defendants-Appellants-Petitioners.

**FILED**

**APR 18, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1 DANIEL KELLY, J. The question before the court is whether Charter Manufacturing Company ("Charter"), the former long-term tenant of property owned by Garland Brothers Joint Venture ("Garland Brothers"), could be liable for injuries to Russell T. Brenner, a construction worker who labored at the former Garland Brothers building after it had been sold to Milwaukee World Festival, Inc. ("MWF").

## I. FACTUAL BACKGROUND

¶2 For 21 1/2 years, Garland Brothers owned the property located at 607 Polk Street in the city of Milwaukee (the "Property"). For 20 of those years, Charter housed its wire manufacturing business at the Property under a triple net lease.[1] One of Charter's tasks in making the facilities operational was the installation of heat treatment furnaces in a below-grade "pit" in one of the buildings. The furnaces extended up from the pit and through a hole cut into the metal grate floor above it.

---

[1] A "triple net lease" is one in which the tenant is typically responsible for expenses such as maintenance, insurance, real estate taxes, and utilities, in addition to its lease payments. See, e.g., Lease, Black's Law Dictionary (10th ed. 2014) (defining a "net-net-net lease," also referred to as a "triple net lease," as "[a] lease in which the lessee pays all the expenses, including mortgage interest and amortization, leaving the lessor with an amount free of all claims."); see also N.J. Indus. Props., Inc. v. Y.C. & V.L., Inc., 495 A.2d 1320, 1321 (N.J. 1985) (explaining that a "triple net lease" is a lease in which "the tenant [is] responsible for maintaining the premises and for paying all utilities, taxes, and other charges associated with the property.").

¶3 Fast forwarding 20 years, Charter notified Garland Brothers that it would terminate its lease at the end of 2009. The lease obligated Charter to remove its machinery (including the heat treatment furnaces) from the Property before surrendering possession. Additionally, Garland Brothers asked Charter to perform several maintenance and repair tasks. One such request was to fill in the pit where the heat treatment furnaces had been located. Garland Brothers later revoked this request in exchange for Charter's commitment to leave the pit in a "clean and safe condition."

¶4 Charter hired Pieper Electric to help it remediate the Property before the end of the lease. Pieper Electric, in turn, subcontracted with Harrison Metals to remove the heat treatment furnaces. Completion of that task left holes in the metal grate floor through which the furnaces had once protruded. Because the holes could pose a danger, Harrison Metals created short plywood boxes to cover them. Harrison Metals did not mark the boxes to indicate their function or tether them in place. In late December 2009, Garland Brothers performed a final walkthrough of the Property with its experts and Charter representatives. Because Garland Brothers had performed numerous inspections throughout the life of the lease, the heat treatment furnaces would have been conspicuous by their absence during this final walkthrough. Garland Brothers did not raise any concerns about the pit, the holes in the floor above it, or the method of covering them.

3

¶5 Charter released possession of the Property to Garland Brothers on December 31, 2009. Garland Brothers thereafter maintained sole possession of the Property until MWF purchased it in "as-is, where-is" condition "with all faults" and took possession on May 3, 2011. MWF had originally slated for demolition the building Charter had occupied but subsequently changed its plans.

¶6 MWF was on the Property multiple times before purchasing it. Its general counsel, for example, personally conducted walkthroughs of the Property while Charter was still occupying it and observed the heat treatment furnaces extending through the metal grate floor. MWF also had a designer inspect the building several times and had the designer specifically consider the feasibility of creating an entryway where the heat treatment furnaces stood. MWF's construction director was also on the Property prior to the purchase to plan for future work. Environmental tests performed as part of due diligence in the sale of the Property also identified the existence of the pit.

¶7 After completing the purchase of the Property, MWF hired Hunzinger Construction ("Hunzinger") to perform demolition and renovation work on the Property. As part of their work, Hunzinger employees, including Mr. Brenner, removed the plywood boxes present in the building. Mr. Brenner did not know that some of these boxes covered holes once occupied by the heat treatment furnaces. Consequently, while removing one of these boxes, he fell through a hole and sustained severe injuries.

4

## II. PROCEDURAL BACKGROUND

¶8   Mr. Brenner and his wife sued MWF, Garland Brothers, and Charter (as well as their insurers) alleging negligence and violation of Wisconsin's safe-place statutes.   As particularly relevant here, the Brenners said Charter was negligent because it concealed or failed to disclose to MWF the holes in the metal grate flooring under the plywood boxes.

¶9   Charter and Garland Brothers moved for summary judgment, relying primarily on the doctrine of caveat emptor as described in the Restatement (Second) of Torts § 352 (Am. Law Inst. 1965) (hereinafter "§ 352").   The circuit court dismissed both parties, concluding that the caveat emptor principle precluded judgment against them.[2]   The Brenners subsequently settled with Charter and Garland Brothers, which they documented with a settlement agreement that included a Pierringer release.[3]

---

[2] The Honorable Richard J. Sankovitz, presiding.

[3] Pierringer v. Hoger, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).   "[A] Pierringer release, in effect, limits a second joint tort-feasor's liability to the amount reflecting its proportion of wrongdoing.   Stated differently, a Pierringer release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants." VanCleve v. City of Marinette, 2003 WI 2, ¶39, 258 Wis. 2d 80, 655 N.W.2d 113 (footnote and internal citation omitted).

¶10 MWF appealed Charter's dismissal.[4] MWF's interest in this question is in ensuring it is exposed to no more than the correct quantum of liability. Notwithstanding Charter's dismissal from the case, if the matter proceeds to trial, a jury would need to apportion liability amongst all eligible defendants——even those who have been dismissed through settlements. If the law of negligence makes Charter eligible for liability, MWF's exposure potentially decreases, resulting in a smaller judgment against it. If Charter is not eligible for liability, the potential judgment against MWF could increase.

¶11 On appeal, MWF argued that Charter was not a "vendor" under § 352, and even if it was, it would still be liable pursuant to the exception from exemption described in Restatement (Second) of Torts § 353 (Am. Law. Inst. 1965) (hereinafter "§ 353"). In a published decision, the court of appeals affirmed the circuit court's summary judgment in favor of Charter.[5] The court of appeals based its opinion on the caveat emptor doctrine as described in § 352, concluding that Charter was a "vendor" within the meaning of the Restatement test. It further found that, because MWF had reason to know of the danger posed by the wooden boxes that covered the holes,

---

[4] MWF did not appeal the dismissal of Garland Brothers, and as to Charter, MWF appealed only the dismissal of the Brenners' negligence claim.

[5] Brenner v. Nat'l Cas. Co., 2015 WI App 85, ¶5, 365 Wis. 2d 476, 872 N.W.2d 124.

§ 353 did not negate the immunity supplied by the caveat emptor doctrine. We granted MWF's timely petition for review and now affirm the court of appeals.

### III. STANDARD OF REVIEW

¶12 This matter is before us on review of a grant of summary judgment dismissing the Brenners' negligence claim against Charter. Summary judgment is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. See Wis. Stat. § 802.08(2) (2015-16).[6] We review a grant of summary judgment de novo, applying the same methodology as the circuit court. Belding v. Demoulin, 2014 WI 8, ¶13, 352 Wis. 2d 359, 843 N.W.2d 373. While our review is independent from the circuit court and court of appeals, we benefit from their analyses. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136. Whether a duty exists under the circumstances, and the scope of any such duty, are questions of law we decide de novo. Hocking v. City of Dodgeville, 2009 WI 70, ¶7, 318 Wis. 2d 681, 768 N.W.2d 552.

### IV. DISCUSSION

¶13 We must determine whether the law of negligence could make Charter liable to the Brenners. Success in that endeavor requires establishing the following: (1) a duty of care owed by Charter; (2) a breach of that duty; (3) a causal connection

---

[6] All subsequent references to the Wisconsin Statutes are to the (2015-16) version unless otherwise indicated.

between the breach and the Brenners' injury; and (4) actual loss or damage resulting from the injury. Gritzner v. Michael R., 2000 WI 68, ¶19, 235 Wis. 2d 781, 611 N.W.2d 906. On summary judgment, only the first issue——whether Charter owed the Brenners a duty of care——was at issue. It is also the only element we address in our analysis here.

¶14 MWF asks us to find that the tort-based duty of a real estate tenant continues even after the tenant vacates the property. The Brenners say, and the circuit court and court of appeals agreed, that the caveat emptor doctrine terminated Charter's duty after it surrendered possession of the Property to Garland Brothers. MWF tells us that caveat emptor is an archaic proposition and that we would do well to join the twenty-first century by abandoning this concept in favor of principles described in the Restatement (Third) of Torts: Physical and Emotional Harm § 51 (Am. Law Inst. 2012) (hereinafter "§ 51"). MWF says the old ways, memorialized in §§ 352 and 353, create dangerous dynamics, the effects of which caused Mr. Brenner's injury. Alternatively, if we should decide not to adopt the Restatement (Third) of Torts on this question, MWF says caveat emptor (as described in the Restatement (Second) of Torts) does not apply to long-term former tenants like Charter. And if it does, MWF says, there are exceptions to this immunity from liability that operate against Charter under the facts of this case.

8

A. Charter's Duty

1. General principles governing "duty"

¶15 Before analyzing the caveat emptor doctrine, we must first describe the duty it is supposed to affect.  MWF says it is "unquestionable" that Charter would owe a duty to the Brenners absent the doctrine of caveat emptor "because everyone owes a duty to everyone else."  (Citing Behrendt v. Gulf Underwriters Ins. Co., 2009 WI 71, 318 Wis. 2d 622, 768 N.W.2d 568.)

¶16 This characterization of Behrendt suggests we have concluded that every negligence claim arrives at court with the first element already proven as a matter of law, or that we have eliminated the first line from the negligence quatrain.  We have not.  See, e.g., *A.E. Inv. Corp. v. Link Builders, Inc.,* 62 Wis. 2d 479, 484, 214 N.W.2d 764 (1974) ("Duty is still an important factor in determining whether *an act* is negligent.").

¶17 What we said in Behrendt is that "everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." Behrendt, 318 Wis. 2d 622, ¶17 (bracket and internal marks omitted) (quoting *Alvarado v. Sersch,* 2003 WI 55, ¶13, 262 Wis. 2d 74, 662 N.W.2d 350).[7]  Immediately following this statement, however, we explained that "[w]hat is within the duty of ordinary care depends on the circumstances under which the claimed duty

---

[7] This is the minority view of Palsgraf v. Long Island R.R. Co., 162 N.E. 99 (N.Y. 1928).

arises. For example, what is comprised within ordinary care may depend on the relationship between the parties or on whether the alleged tortfeasor assumed a special role in regard to the injured party." Behrendt, 318 Wis. 2d 622, ¶18 (quoting Hoida, Inc. v. M & I Midstate Bank, 2006 WI 69, ¶32, 291 Wis. 2d 283, 717 N.W.2d 17).

¶18 One of the most significant circumstances relating to the nature of Charter's duty in this case is the relationship between the parties, as evidenced by the sequence in which the defendant parties possessed the Property. As relevant here, Charter was the first to possess. Garland Brothers then took possession upon expiration of Charter's lease. Finally, MWF gained possession of the Property through its purchase from Garland Brothers.

¶19 Therefore, whether Charter is potentially liable in negligence to the Brenners depends on whether its duty "to the world at large . . . [to] refrain[] from those acts that may unreasonably threaten the safety of others," Behrendt, 318 Wis. 2d 622, ¶17 (internal marks and citation omitted), extended to telling not just Garland Brothers, but all future strangers who may come into possession of the Property, that there were holes in the floor under the plywood boxes.

¶20 The only support MWF identified for this proposition was § 51, in conjunction with its over-simplification of our holding in Behrendt. So we review § 51 to determine whether it provides any insight on the nature of Charter's duty under these circumstances.

10

2.  Restatement (Third) of Torts: Physical & Emotional Harm

§ 51

¶21  MWF urges us to adopt § 51 because it believes this provision describes a superior view of what the law of premises liability ought to be.  This section states:

> Subject to [Restatement (Third) of Torts: Physical & Emotional Harm] § 52, a land possessor owes a duty of reasonable care to entrants on the land with regard to:
>
> > (a)  conduct by the land possessor that creates risks to entrants on the land;
> >
> > (b)  artificial conditions on the land that pose risks to entrants on the land;
> >
> > (c)  natural conditions on the land that pose risks to entrants on the land; and
> >
> > (d)  other risks to entrants on the land when any of the affirmative duties provided in Chapter 7 is applicable.

§ 51.  This provision does not define "land possessor," but we need only flip back to Restatement (Third) of Torts: Physical & Emotional Harm § 49 (Am. Law Inst. 2012) (hereinafter "§ 49") for assistance:

> A possessor of land is
>
> > (a)  a person who occupies the land and controls it;
> >
> > (b)  a person entitled to immediate occupation and control of the land, if no other person is a possessor of the land under Subsection (a); or
> >
> > (c)  a person who had occupied the land and controlled it, if no other person subsequently became a possessor under Subsection (a) or (b).

§ 49.

11

¶22  If we were to adopt § 51 verbatim (incorporating the § 49 definition), it would not bear the weight of MWF's proposition.  It does not, ex proprio vigore, apply to companies in Charter's position.  The unadorned language applies, instead, to a "land possessor."  The only party in this case that is a "land possessor" in relation to the Property is MWF.  But the language is not unadorned——it is festooned by eighteen pages of comments and illustrations (not including the Reporter's Note).

¶23  MWF says we may engage comment t to § 51 to transfer its operation to former land possessors.  This comment, in relevant part,[8] explains that "[a] former possessor who creates a risk of harm when in possession of the land continues to be subject to the ordinary duty of reasonable care provided in § 7 for that risk, even after possession is relinquished to another."  § 51 cmt. t (emphasis added).  Similarly, comment h to § 49, entitled "Former possessors," states, in part:  "A person who has relinquished possession and control of land to another is not subject to the duties provided in §§ 51 to 53 of this Chapter, with one exception.  See § 51, Comment t."

¶24  Thus, both §§ 49 and 51 turn our attention to Restatement (Third) of Torts: Physical & Emotional Harm § 7 (Am. Law Inst. 2010) (hereinafter "§ 7"), which imposes a general duty of care:  "An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of

_____

[8] Comment t is extensive——together with its illustrations, it encompasses nearly four pages of text.

physical harm."  § 7(a).  But this provision does not, on its own terms, say anything about land possessors, or the persistency of liability once possession of the land transfers to another.  Nor does it describe a principle or methodology by which we may derive the rule advocated by MWF.[9]

¶25 Instead, the actual text of these Restatement provisions comprise a basically faithful, and unremarkable, rendition of the law as it currently exists in Wisconsin.  As the first comment to § 51 recognized, its primary purpose has nothing to do with this case——it is to clarify that a possessor of land owes a unitary duty of care to anyone who enters the land and that the land possessor's duty is not dependent upon the entrant's status:  "This Section rejects the status-based duty rules and adopts a unitary duty of reasonable care to entrants on the land."  § 51 cmt. a.  Like § 51, this court rejected status-based duties long ago.  See, e.g., Antoniewicz v. Reszcynski, 70 Wis. 2d 836, 839, 236 N.W.2d 1 (1975) (concluding that "the distinction between the duty heretofore owed by a land occupie[r] to licensees and to invitees should be abolished, and that the duty of the land occupier be that required in any negligence action——ordinary care under the

---

[9] MWF did not address § 7 or its applicability in this case. Rather, it simply contends that § 51 itself imposes a duty of care on a former possessor of land.

circumstances."[10]  And our adoption of Palsgraf's minority view was already distant history before the advent of § 7.  See, e.g., A.E. Inv. Corp., 62 Wis. 2d at 483 (explaining that this court has adopted the Palsgraf minority view).  Thus, adopting the text of those sections would do little, if anything, to alter or advance the development of law in this state with respect to those general principles.

¶26 It is apparent from our review of the relevant sections of the Restatement (Third) of Torts: Physical & Emotional Harm that the life of MWF's argument is not in the text of the various provisions, but only in the commentary.[11]  By itself, the text tells us nothing about the duties of former land possessors.  Thus, to reach MWF's conclusion we would need

---

[10] However, the Antoniewicz court "decline[d] . . . to change the immunities which a land occupier enjoys in respect to trespassers." Antoniewicz v. Reszcynski, 70 Wis. 2d 836, 839, 236 N.W.2d 1 (1975).

[11] This is not the only instance in which the commentary reads substantive content into § 51 without the support of corresponding text. For example, comment t says § 51 includes certain disclosure duties and liability time limits despite the absence of any such declaration, or even suggestion, in § 51's text. See id. ("[t]his Section adopts the actual discovery aspect but not the 'should discover' portion of [Restatement (Second) of Torts] § 352" with respect to liability time limits).

to adopt not § 51, but comment t.[12]  We next turn to the law MWF would have us replace with this comment.

## B.  Caveat Emptor

¶27  "Caveat emptor" operates as a limited exception to the rule that "everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others."  Behrendt, 318 Wis. 2d 622, ¶17 (bracket, internal marks, and citation omitted).  In Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 288 N.W.2d 95 (1980), we explained that "[t]he traditional legal rule that there is no duty to disclose in an arm's-length transaction is part of the common law doctrine of caveat emptor which is traced to the attitude of rugged individualism reflected in the business economy and the law of the 19th century."  Id. at 29.

¶28  Caveat emptor——or "buyer beware"——finds expression in § 352, which states:

> Except as stated in [Restatement (Second) of Torts] § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or

---

[12] We recognize that the ALI adopts the comments as well as the actual text of § 51, and that the comments express how the ALI would like courts to understand the text.  Thus, were we to adopt § 51 (as MWF requests), we would be inserting not just the few spare lines of the text into our law, but the 18 pages of copious comments and illustrations as well.  It would be imprudent to import so much material without closely examining it first, especially when the comments say so much that the text simply does not.

15

artificial, which existed at the time that the vendee took possession.

§ 352. We have recognized that the caveat emptor principle broadly applies to the transfer of real estate interests:

> [S]ecs. 352, 353 [of the Restatement (Second) of Torts], sets forth the broad principle that a vendor is not liable for bodily harm caused to his vendee, or others, after the vendee has taken possession except where the vendor has concealed or failed to disclose a dangerous condition known to him, but not to the vendee, and the vendor has reason to believe that the vendee will not discover it.

Fisher v. Simon, 15 Wis. 2d 207, 214, 112 N.W.2d 705 (1961). See also Pines v. Perssion, 14 Wis. 2d 590, 594-95, 111 N.W.2d 409 (1961) ("A tenant is a purchaser of an estate in land, and is subject to the doctrine of *caveat emptor*.")

¶29 But we do not apply the rule to all real estate transactions. In Fisher itself we found the rule inapplicable with respect to the owner of real estate who built a house thereon for the express purpose of selling it. 15 Wis. 2d at 216, 219. We analogized the transaction to the sale of chattels and borrowed from product liability principles in finding that the vendor owed a duty to his vendee. Id. In Pines, we found an implied warranty of habitability in a residential lease after surveying the legislative imposition of various health and safety requirements related to residential properties. 14 Wis. 2d at 594-96. And in Ollerman, we held that a real estate subdivider-vendor had "a duty to a 'non-commercial' purchaser"

to disclose material facts known to the vendor but that the purchaser would not readily discern.  94 Wis. 2d at 42.[13]

¶30 These exceptions, however, are narrow and do not detract from the continuing health of the doctrine.  Indeed, the caveat emptor doctrine, as described in § 352, has retained its vitality in the years since Ollerman.  We remarked in Kaloti Enterprises, Inc. v. Kellogg Sales Co., hearkening back to Ollerman, that

> parties to a business transaction must "use their faculties and exercise ordinary business sense, and not [] call on the law to stand *in loco parentis* to protect them in their ordinary dealings with other business people."  Further, "in a free market the diligent should not be deprived of the fruits of superior skill and knowledge lawfully acquired."

2005 WI 111, ¶18, 283 Wis. 2d 555, 699 N.W.2d 205 (bracket in Kaloti; internal citation omitted) (quoting Ollerman, 94 Wis. 2d at 30).[14]

---

[13] We said in Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 288 N.W.2d 95 (1980), that "[t]his court has moved away from the rule of caveat emptor in real estate transactions, as have courts in other states." Id. at 38 (emphasis added).  But this was in the context of discussing Restatement (Second) of Torts § 551, which generally addresses "benefit of the bargain" considerations, not liability for physical injury after relinquishing possession of real estate.  The logic of caveat emptor does not apply with quite as much force to § 551 cases, and such cases certainly do not present the harmful dynamics we address in Section IV.C, infra.  Thus, we do not believe this statement gives us guidance in resolving this case.

[14] At one point, we did suggest we had abandoned this doctrine.  In a case involving the sale of real property we said "[t]he common law doctrine of caveat emptor has been abrogated in this state and elsewhere . . . ."  State v. Alles, 106 Wis. 2d 368, 378, 316 N.W.2d 378 (1982).  We made that comment

(continued)

¶31 Our court of appeals has not had any difficulty identifying the circumstances in which this doctrine applies, or in applying it.  For example, in Bagnowski v. Preway, Inc., a homeowner filed suit against the former owner, arguing that the former owner had negligently installed a chimney that caused a fire.  138 Wis. 2d 241, 244, 405 N.W.2d 746 (Ct. App. 1987).  On appeal, the court of appeals considered, inter alia, the instructions and special verdict form given to the jury, noting that they were based on §§ 352 and 353.  Bagnowski, 138 Wis. 2d at 246-47.  Having concluded that the former homeowner was not a "builder-vendor" (as in Fisher) but rather a "private homeowner-vendor," the court of appeals found no error in the caveat emptor-based instructions and verdict form the circuit court had given the jury.  Bagnowski, 138 Wis. 2d at 248-49.

¶32  In McCarty v. Covelli, 182 Wis. 2d 342, 514 N.W.2d 45 (Ct. App. 1994), the court of appeals had to assign liability for an injury in a relational context similar to that in this case.  Mr. McCarty sustained an injury on a rental property while assisting an evicted tenant vacate the premises.  Id. at 345.  He sued both the current and prior owners of the property.

---

in the context of a statute criminalizing the failure to disclose encumbrances in a real estate transaction, which removed from the ambit of the caveat emptor doctrine only the conduct proscribed by the statute.  However, we cited no authority to support such a broadly stark proposition beyond that specific circumstance.  We find that this orphan comment is not an accurate reflection of the law, either then or now, beyond the statute under consideration in that case.

18

Id.    The court had no difficulty identifying caveat emptor principles (as expressed in §§ 352 and 353) as the controlling decisional standards. McCarty, 182 Wis. 2d at 345-46.    Thus, as the court of appeals aptly noted in the decision we are reviewing, this doctrine still applies in Wisconsin.    See Brenner v. Nat'l Cas. Co., 2015 WI App 85, ¶28, 365 Wis. 2d 476, 872 N.W.2d 124 (hereinafter "Brenner I").

¶33  MWF's argument, of course, is not so much that caveat emptor has fallen into desuetude in Wisconsin, but that the time has come for its demise:  "The Court should reject the outdated rule of caveat emptor implicit in [Bagnowski and McCarty] and embedded in the Restatement (Second) of Torts §§ 352 and 353 to bring Wisconsin premises liability law and the duties of land possessors into the 21st century by adopting the Restatement (Third) of Torts § 51."  Thus, we now consider whether it would be appropriate for us to adopt comment t to § 51.

### C.    Comment t versus Caveat Emptor

¶34  This is no small change that MWF asks of us.  The real estate transactions that created the question we are addressing here are entirely unremarkable——a commercial tenant vacated a commercial property and the owner (a commercial entity) subsequently sold the property to another commercial entity. These types of transactions are the daily fare of the commercial real estate world.  With respect to the structural elements of such transactions, there is nothing immediately apparent to distinguish them from those we are examining.  Consequently, whatever decision we make here will affect not just Charter, but

19

an untold (and certainly large) number of vendors who once owned Wisconsin real estate.

¶35 Adopting comment t would dramatically unsettle property interests that thrive on stability. Divorcing liability for injuries caused by a dangerous condition from the ability to control for it would be just the first (but most obvious) upset attendant on adopting comment t. For example, a land possessor could choose to mitigate, or even eliminate, the risk of injury through management practices rather than by repairing the dangerous condition. It could accomplish this through the simple expedient of restricting access to dangerous areas entirely, or allowing access only to those who had been trained to safely engage the condition, or who had been warned of its existence. A subsequent possessor, however, may simply leave the dangerous condition open to anyone who comes upon it. Thus, the former possessor's risk of exposure could be greatly expanded, or even created ab initio, by the acts of successors. The present rule accounts for this reality by logically and justifiably pairing potential liability with the opportunity to reduce, eliminate, or manage around it. Allowing persistent exposure to liability without the concomitant ability to control for it is a rule with little to recommend to us.[15]

---

[15] We are not the first to see the connection between caveat emptor and these circumstances:

> [T]he rationale underlying the general rule of nonliability . . . [of] one who has transferred ownership and control is no longer held liable because (1) he no longer has
> (continued)

20

¶36 Second, comment t creates an entirely unforeseeable quantum of risk exposure. A former possessor, for example, cannot anticipate how subsequent owners might use the property. The original possessor may allow only a very few people to enter the premises, but an owner at the second remove (or even more distant) may unforeseeably open the property to the public at large. Because we establish negligence in relation to the act in question, rather than in relation to the person harmed, the former possessor might find itself liable to an immense population it had never expected.

¶37 Third, comment t would make a former possessor the insurer of all its successors. A former land possessor who created a risk of harm would remain subject to liability even after he disclosed the risk to the subsequent purchaser. See § 51 cmt. t, Illustration 11 (explaining that a former land possessor who created a risk of harm retains a duty of care under § 7 even after notifying the current land possessor of the risk and where the current land possessor chooses not to reduce, manage, or eliminate the risk of harm). Because comment t would make the former possessor stand as the insurer of all subsequent possessors, this rule would perversely dampen the successors' incentive to manage the risk or repair the dangerous condition.

---

control and thus may not enter the property to cure any deficiency, and (2) he cannot control the entry of persons onto the property or provide safeguards for them. Preston v. Goldman, 720 P.2d 476, 479 (Cal. 1986).

21

¶38 Fourth, MWF would have us make former possessors stand as insurers to all successive possessors without indicating whether there is an insurance market in which former possessors could purchase coverage.  The Supreme Court of California recognized this potentially profound economic dislocation over three decades ago in Preston v. Goldman, 720 P.2d 476 (Cal. 1986).  The court recognized that "[t]he ascription of liability in this context to a party with control is . . . reflected in the usually applicable insurance coverage." Id. at 483.  So the court rejected the invitation to visit those uninsurable risks on former possessors, concluding that it would "continue[] to treat ownership and control as a fundamental requirement for ascribing liability."  Id.[16]  Imposing liability on unwitting former possessors who would have no apparent means of insuring their exposure is injudicious.

¶39 Finally, adopting comment t carries the very real risk that we would be effectively renegotiating, retroactively and as a matter of law, an unknowable number of Wisconsin real estate transactions, including the ones before us.  Contracts, including those for the lease or sale of real estate, incorporate the law extant at the time of execution. See, e.g., Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶60, 295

---

[16] That Preston predates the Restatement (Third) of Torts is of no consequence on this point, as the parties provide no indication that the insurance industry currently offers coverage to former real estate possessors for the risk of liability comment t would create.

22

Wis. 2d 1, 719 N.W.2d 408. Thus, when a vendee purchases Wisconsin real estate as-is, without warranty, its contract incorporates the caveat emptor doctrine.[17] So too with leases.[18] Presumably, commercial entities like Charter, Garland Brothers, and MWF account for undisclosed and unknown risks when they negotiate the terms of their transactions. As relevant here, a purchasing party that assumes those risks can, because of that assumption, negotiate a lower purchase price. MWF, having reaped the financial benefit of a lower price in exchange for assuming those risks, would now enlist us in shifting some or all of those risks to Charter. If we accepted that invitation, we would necessarily reallocate not just the benefit of the bargains in this case, but the benefits of all similar Wisconsin real estate transactions younger than the applicable statute of limitations. Further, the disruption would not be limited to those transactions that have already occurred. Prospectively, adopting comment t would likely distort the commercial real estate market, at least in the short term, as vendors inflate sales prices to reserve an actuarially-rational amount of funds

---

[17] Barnard v. Kellogg, 77 U.S. 383, 394 (1870) ("The parties negotiated on the basis of caveat emptor, and contracted accordingly.").

[18] "[N]o action lies by a tenant against a landlord on account of the condition of the premises hired, in the absence of an express warranty or of active deceit. This is a general rule of caveat emptor." Doyle v. Union Pac. R. Co., 147 U.S. 413, 425 (1893) (internal marks and citation omitted).

23

against potential liability until the insurance market creates and prices appropriate policies or riders.[19]

¶40  We decline MWF's invitation to adopt comment t because it would introduce dramatic changes to the duty a former land possessor owes under Wisconsin law, and would negatively impact settled expectations, and settled rights, between real estate vendors and vendees.  Further, MWF has identified no compelling reason to abandon the current state of our law, and certainly nothing important enough to justify the market dislocations comment t would likely cause.  We next consider whether Charter could be liable to the Brenners under existing Wisconsin law as reflected in §§ 352 and 353.

## D. Charter's liability to the Brenners

¶41  To determine whether Charter could be liable to the Brenners under current Wisconsin law, we must answer two questions.  The first is whether caveat emptor governs the relationship between Charter and successive possessors of the

---

[19] We could control for at least the retroactive consequences of adopting comment t by "sunbursting" the change so that it would apply only prospectively.  See Jacque v. Steenberg Homes, Inc., 209 Wis. 2d 605, 623-24, 563 N.W.2d 154 (1997) (explaining that where the announcement of a new rule will result in an inequity if given retroactive effect, the court may instead apply the newly announced rule prospectively if there is a compelling judicial reason to do so).  We decline to consider this option because the nature and extent of the relationships and expectations we would be changing suggest that, on the record before us, we simply have insufficient information to determine whether the downstream consequences would actually represent a net improvement over the status quo.

Property. The second is whether, if caveat emptor applies, any of the exceptions to the doctrine apply.

### 1. Charter and the caveat emptor doctrine

¶42 MWF argues that our caveat emptor cases apply only to vendors of land and that Charter cannot be a vendor of land because it was merely a former tenant that did not sell the Property to anyone. Thus, according to MWF, when the circuit court and court of appeals denominated Charter a "vendor" within the meaning of § 352, they expanded the meaning of that term without warrant or justification.

¶43 MWF's argument has some initial appeal. By its own terms, § 352 applies only to vendors:

> Except as stated in [Restatement (Second) of Torts] § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

§ 352. However, because of the nature of Restatements, this provision describes the beginning of our inquiry, not the end. As significant and important as a Restatement is, it is not a code of laws. Instead, Restatements "aim at clear formulations of common law and its statutory elements or variations . . . ." American Law Institute, Frequently Asked Questions, https://www.ali.org/publications/frequently-asked-questions/ (last visited Mar. 6, 2017). They also attempt to "reflect the law as it presently stands or might appropriately be stated by a court." Id. Because the common law can vary across the States,

25

sometimes significantly, these goals can often be more aspirational than descriptive.[20]  Thus, because the Restatements are not, in themselves, authoritative, MWF's task goes beyond demonstrating that the text of § 352 excludes Charter from its operation.  It must also demonstrate that this exclusion either reflects the current state of the law in Wisconsin, or that this is a question of first impression, the answer to which should be guided by the logic of § 352's focus on vendors.

¶44  We have not previously determined whether a former commercial tenant such as Charter is a vendor within the meaning of § 352.  See Brenner I, 365 Wis. 2d 476, ¶24 (recognizing that prior to its decision in this matter, no published Wisconsin case had considered whether a former tenant qualifies as a vendor under § 352).  So in determining whether commercial tenants occupy the same legal position as vendors for caveat emptor purposes, we will consider the logic behind the doctrine before deciding whether § 352 appropriately excludes commercial tenants from its terms.

¶45 Freedom of contract and the right of inspection provide the primary justifications for the caveat emptor

---

[20] The Restatements themselves recognize this.  For example, the Reporter's Note regarding comment t to § 51 frankly admitted the proposed rule was not a statement of the law all across the country:  "Courts are split on whether a former possessor who created a risk on the land remains subject to liability or whether transfer of the land absolves the possessor of liability, as provided in the Second Restatement."  § 51 Reporter's Note cmt. t.

doctrine.  As the United States Supreme Court observed when our country was considerably younger,

> [n]o principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of *caveat emptor* applies.

Barnard v. Kellogg, 77 U.S 383, 388 (1870).  A vendee wishing to ensure he does not take on more liability exposure than desired must inform himself of what he can about what he buys.  Bostwick v. Mut. Life Ins. Co. of N.Y., 116 Wis. 392, 400, 89 N.W. 538 (1902), on reh'g, 116 Wis. 392, 92 N.W. 246 ("[T]he doctrine that one must observe what he has reasonable opportunity for knowing in matters of contract is within the rule of caveat emptor . . . .").  He may, of course, choose to negotiate an express warranty as a substitute for his inspection to cover the risk he takes for himself:  "And there is no hardship in it [caveat emptor], because if the purchaser distrusts his judgment he can require of the seller a warranty . . . ."  Barnard, 77 U.S. at 388.  But if he chooses to purchase with neither an inspection nor a warranty, the caveat emptor doctrine holds him responsible for his decision.  Id. ("If he is satisfied without a warranty, and can inspect and declines to do it, he takes upon himself the risk that the article is merchantable.");  Doyle v. Union Pac. R. Co., 147 U.S. 413, 425 (1893) ("This is a general rule of caveat emptor.  In the absence of any warranty, express

27

or implied, the buyer takes the risk of quality upon himself."); McBurney v. Young, 133 S. Ct. 1709, 1776 (2013) ("'Caveat emptor being the rule with us in the absence of a special agreement, it is just and essential to the protection of persons intending to purchase or take incumbrances that they be allowed the right of inspection.'" (quoting State v. Grimes, 84 P. 1061, 1073 (Nev. 1906))).

¶46 This rule grew out of the natural business dynamic that the person in the best position to adjudge potential risk is the one affected by it:  "[T]he law requires men, in their dealings with each other, to exercise proper vigilance, and apply their attention to those particulars which may be supposed to be within reach of their observation and judgment, and not close their eyes to the means of information which are accessible to them."  Bostwick, 116 Wis. at 400 (quoting Mamlock v. Fairbanks, 46 Wis. 415, 418, 1 N.W. 167 (1879)); see also Barnard, 77 U.S. at 388 ("Such a rule, requiring the purchaser to take care of his own interests, has been found best adapted to the wants of trade in the business transactions of life.").

¶47 These principles instruct that caveat emptor should apply in the commercial tenancy context just as it does in the vendor-vendee relationship described in § 352.  The one difference is that a tenant will, when commencing the tenancy, occupy the position of a vendee with respect to the landlord, while at the end of the tenancy he will occupy the position of the vendor.  We will address the relationship from both perspectives.

28

¶48 When a lessor enters a lease, he is purchasing an interest in the estate. See, e.g., Pines, 14 Wis. 2d at 594-95. Functionally, the tenant's purpose for entering that relationship is largely the same as that of a vendee——to obtain possession of the property and to put it to whatever use may be desirable, so long as it conforms to the terms of the tenancy. With respect to the condition of the property, therefore, they operate under similar risks. The property either will or will not be suitable for their purposes, and it either will or will not contain dangerous conditions that could cause injury to them or others.

¶49 The methods of controlling for that risk are the same for both the tenant and the vendee. Both may inspect the premises prior to the transaction to discover defects or other dangerous conditions. If not satisfied with their inspections, or if the inspection raises concerns about undiscoverable latent defects, both can negotiate warranties to cover the risk. Consequently, we have previously recognized that caveat emptor applies when a tenant executes a lease. Id. ("A tenant is a purchaser of an estate in land, and is subject to the doctrine of caveat emptor.")

¶50 At the termination of the tenancy, the lessee occupies the position of the vendor as he transfers possession of the property back to the landlord. Just as the interests of a vendee and a tenant (to the extent they are relevant to this analysis) coincided at the beginning of the tenancy, so too do the relevant interests of a vendee and a landlord coincide at

29

the end.  The landlord, cognizant that the tenant has had exclusive possession of the property, must ensure he is receiving the property from the tenant in the condition required by the contract.  The landlord has the same opportunity as the vendee to control for the risk that it might be otherwise, either by requiring a warranty from the tenant (in the initial lease negotiation), or in a thorough inspection to ensure the property meets the condition required by the lease when the tenant vacates.

¶51 The similarities between the commercial tenancy and vendor-vendee relationships extend to the intolerable consequences of not applying caveat emptor.  The former tenant, like the vendor, would suffer continuing exposure to liability even after he can no longer reduce, eliminate, or manage around the dangerous condition. The quantum of his exposure also slips beyond his control as the landlord or other successive possessors expose the property's dangerous condition in a way that may exacerbate, or even create, the potential for injury. He would also, like the vendor, stand as liability insurer to all subsequent possessors, and would similarly have no access to the insurance market (at least until the industry adapted).

¶52 As did the circuit court and court of appeals, we find Brock v. Rogers & Babler, Inc., 536 P.2d 778 (Alaska 1975) and Great Atlantic & Pacific Tea Company, Inc., 408 N.E.2d 144 (Ind. Ct. App. 1980), instructive on this question.  Brock addressed whether a gravel excavation company that had remediated the property it leased into an artificial lake could be liable to a

child who almost drowned approximately three years after the company relinquished possession of the property. 536 P.2d at 779. The Supreme Court of Alaska applied § 352 and explained that although that section refers to vendors of land, its principle was nevertheless "broad enough to cover a former lessee who had relinquished his possessory interest in the premises." Brock, 356 P.2d at 782. It explained that liability is generally limited to those who are in possession and control of the property, and that those not in possession should not suffer liability because they have no authority or ability to prevent the injury from occurring. Id.

¶53 The Indiana Court of Appeals reached the same conclusion in Great Atlantic. There, Great Atlantic leased a building in which an opening in the floor had been created for a conveyor belt to move stock from storage in the basement to the sales floor. 408 N.E.2d at 146. When the lease terminated, Great Atlantic released possession to the landlord, which then offered the property for sale. Id. A prospective buyer fell into the conveyer-belt opening in the floor and sustained injuries. Id. The Indiana Court of Appeals took its cue from Brock, concluding that "[t]he new owner, upon assuming control and possession, becomes responsible for the safety of structures erected by his predecessors" and that "liability for injury ordinarily depends upon the power to prevent injury and, therefore, rests upon the person who has control and possession through ownership, lease, or otherwise." See Great Atl., 408 N.E.2d at 147-48.

¶54 Here, Charter leased the Garland Brothers' building for approximately 20 years under a triple net lease, meaning that——for purposes of the condition of the property——Charter had the type of exclusive possession and control that a fee owner would have. At the end of the tenancy, Garland Brothers exercised its contractual right to thoroughly inspect the Property before Charter relinquished possession on December 31, 2009. Thereafter, Charter no longer had the right to access or control the Property, just like property vendors. Consequently, when Mr. Brenner suffered his injuries in November 2011, Charter had exactly the same relationship to the Property as if it had been its fee owner, to wit, none.

¶55 Because Charter, as a former tenant, stands in the same position as a vendor (for purposes of the caveat emptor doctrine described in § 352) and because MWF——not Charter——was in possession of the Property at the time of Mr. Brenner's injuries, Charter is immune from liability unless a recognized exception lifts the immunity and restores the potential for liability.

## 2. Caveat emptor and its exceptions

¶56 MWF argues that, under the facts of this case, § 353 pushes Charter out from under the protective umbrella of the caveat emptor doctrine. This section provides that:

> (1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others

32

upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise, the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

§ 353. We have previously recognized the essence of the exception contained in § 353(1). Fisher, 15 Wis. 2d at 214 (caveat emptor does not apply "where the vendor has concealed or failed to disclose a dangerous condition known to him, but not to the vendee, and the vendor has reason to believe that the vendee will not discover it."). We will apply the language of § 353 (as MWF requested) to evaluate this part of its argument, but without opining on whether its text is an exacting statement of Wisconsin law. Only if we conclude that MWF's argument would succeed under the language of § 353 will we determine whether it comports with Wisconsin law, or describes a standard we should adopt.

33

¶57 For purposes of our discussion here, § 353(1) requires the proponent of the rule to establish, <u>inter alia</u>, each of the following four elements:

(1) The vendor concealed or failed to disclose to his vendee any condition, whether natural or artificial, that involves unreasonable risk to persons on the land;

(2) The vendor knew or had reason to know of the condition, and realized or should have realized the risk involved;

(3) The vendee did not know, or have reason to know, of the condition or the risk involved; and

(4) The vendor had reason to believe that the vendee would not discover the condition or realize the risk.

§ 353(1).

¶58 MWF spent nearly its entire argument discussing these elements as between it and Charter. But that is the wrong relationship to consider. With respect to Charter, it is Garland Brothers, not MWF, that is the vendee. So MWF's task is to demonstrate that the facts satisfy the elements of § 353(1) as between Charter and Garland Brothers. If they do, only then would Charter's liability persist until (a) the vendee (or successors) has had a reasonable opportunity to discover the condition and to take effective precautions, or (b) the vendee discovers the dangerous condition and has reasonable opportunity to take effective precautions if the vendor has actively concealed the condition. § 353(2).

¶59 For the sake of our analysis, we will assume MWF can establish the first two elements of the § 353(1) test, and proceed directly to the third element, which requires MWF to establish that Garland Brothers did not know, or have reason to know, of the danger presented by the holes in the floor under the plywood boxes. The circuit court found that there was insufficient evidence to hold that Garland Brothers had actual knowledge of the dangerous condition but was silent as to whether it had reason to know of that condition. For the following reasons, we believe the record unequivocally demonstrates that Garland Brothers had reason to know of the holes under the plywood boxes.

¶60 First, the record establishes that Garland Brothers, through its agent, conducted an annual inspection of the Property over the course of Charter's 20-year tenancy. During those annual inspections, there is no question that Garland Brothers would have seen the heat treatment furnaces extending upward through the holes in the metal grate floor. Next, after Charter gave notice it was terminating the lease, Garland Brothers identified several requirements Charter was required to satisfy prior to vacating the Property. Among them was that, after removing the heat treatment furnaces (as required pursuant to the lease's terms), Charter was to fill in the pit where the furnaces had been. When Charter objected to that requirement, Garland Brothers agreed to substitute a requirement that Charter leave the pit in a "clean and safe condition."

¶61 Garland Brothers necessarily knew that removing the heat treatment furnaces would leave holes in the floor. And it undoubtedly had an interest in knowing whether doing so would leave the Property in a dangerous condition. Further, it had a reasonable motivation for determining whether Charter left behind dangerous conditions, and ample opportunity to discover whether it did.

¶62 Garland Brothers' actions demonstrate it was satisfied Charter had left the Property in a safe condition. When Garland Brothers completed its final walkthrough and inspection of the Property with Charter in late 2009, Garland Brothers did not raise any concerns about the condition in which Charter had left the pit or the corresponding holes in the metal grate floor.[21] It then executed a "Release Agreement" with Charter, in which it agreed that Charter had surrendered the Property "in the physical condition required under the Lease and [Garland Brothers] hereby releases Charter from any further liability or claims in connection with such obligation or in any way relating

---

[21] The precise date on which Charter's contractor placed the plywood boxes over the holes in the metal grate floor is not clear. The parties' briefs generally refer to them as having been in place no later than December 31, 2009, when Charter surrendered the Property to Garland Brothers. However, one of the briefs filed on behalf of Charter suggests the contractor may not have put the boxes in place until after Charter vacated the Property. MWF's argument presupposes that Charter knew, while it was yet in possession of the Property, that the boxes concealed holes in the floor. Consequently, our analysis operates on that presupposition.

36

to the physical condition of the Property or Charter's performance of its obligations under the Lease."

¶63 We are convinced by this that Garland Brothers had reason to know of the holes in the floor underneath the plywood boxes. We are not the only ones to arrive at that conclusion——MWF argued the same thing itself while opposing Charter's motion for summary judgment, and for much the same reasons:

> Together, GBI[22] and GBJV,[23] failed to disclose not only the existence of the pit but, more importantly, that Charter had created holes in the floor above the pit. . . .
>
> GBI and GBJV should have known that the holes existed as the pit was the subject of negotiations when Charter terminated its lease and GBI conducted an inspection of the premises before accepting the premises from Charter on behalf of GBJV. Further, GBI and GBJV are (or were) in the business of owning, managing and leasing industrial properties. GBJV had leased the property to Charter for more than twenty years and GBI had, apparently, managed the lease for a lengthy time——conducting annual inspections.

Yes, just so.

¶64 Finally, as the circuit court ably described, MWF argued itself into a box canyon on this point. By asserting that Garland Brothers is chargeable with constructive knowledge of the covered holes by virtue of its possession and control of the Property, it implicitly (but necessarily) argued that it should also be charged with that knowledge. MWF had

---

[22] GBI was Garland Brothers' agent.

[23] GBJV is Garland Brothers.

37

approximately as much time, opportunity, and motivation to discover defects in the Property before Mr. Brenner's injury as did Garland Brothers.   Thus, if possession and control are enough to charge Garland Brothers with constructive knowledge of the covered holes, it must necessarily do the same for MWF.   So even if this analysis required us to examine the relationship between MWF and Charter, it would be impossible for MWF, because of its own argument, to establish the third element of § 353(1).

¶65 As it is, however, the proper relationship to examine is the one that obtained between Charter and Garland Brothers. And because we find that Garland Brothers had reason to know of the holes covered by the plywood boxes, MWF cannot establish the third element of the § 353(1) analysis.   Inasmuch as this provision requires MWF to demonstrate all four elements, we conclude that § 353 does not remove the exemption from liability provided by the caveat emptor doctrine.

## V.   CONCLUSION

¶66 The doctrine of caveat emptor——"buyer beware"——has long been a part of the common law of this state.   Although we have recognized some narrow exceptions as it applies to real estate transfers, the doctrine still describes a vital and important restriction on liability when real property passes from one possessor to the next.   Accordingly, we decline to adopt comment t to § 51.

¶67 We find that the caveat emptor doctrine applies to Charter just as it would have if Charter had been the fee simple owner when it transferred possession of the Property back to

Garland Brothers.  Because MWF did not establish any exception to the doctrine in this case, Charter's duty to subsequent possessors expired when it surrendered possession of the Property.  Consequently, Charter cannot be liable in negligence for Mr. Brenner's mishap.

*By the Court.*—The decision of the court of appeals is affirmed.

¶68 REBECCA GRASSL BRADLEY, J., did not participate.