HRUZ, J.
*816 ¶1 Kemper Center, Inc. and Gary Vaillancourt appeal a grant of summary judgment to Annette Flynn, proceeding on behalf of the State of Wisconsin, in Flynn's action to enforce Wisconsin's Public Records Law, WIS. STAT. §§ 19.31 -.39 (2015-16).[1] The sole issue in this case is whether Kemper Center, Inc. is a "quasi-governmental corporation" and therefore an "authority" having custody of a record within the meaning of § 19.32(1). Based upon the undisputed facts, we conclude as a matter of law that Kemper Center, Inc. is not a quasi-governmental corporation subject to the Public Records Law. Accordingly, we reverse the circuit court's grant of summary judgment and remand with directions to dismiss the complaint.
BACKGROUND
¶2 Kemper Center, Inc. was incorporated on July 2, 1975, as a Wisconsin nonstock corporation. The corporation was formed by alumnae of Kemper Hall, a private all-girls boarding school in Kenosha that had closed. According to Kemper Center, Inc.'s articles of incorporation, its stated purpose was to raise funds to allow the City of Kenosha or Kenosha County to purchase and maintain the former Kemper Hall property. By facilitating the property's preservation, Kemper Center, Inc. sought to encourage the property's "use as a park, recreational area, cultural *221 center or *817 other such use open to, and for the benefit and enjoyment of, the general public."[2]
¶3 A proposal for the City of Kenosha to purchase Kemper Hall was defeated at referendum. Kemper Center, Inc. fared better with Kenosha County, which purchased Kemper Hall in 1977. No County funds were used for the purchase. Instead, the $225,000 purchase price was paid with $117,789 in funds raised by Kemper Center, Inc. The remainder of the purchase price came from two grants to the County. The Kemper Hall property was conveyed directly to the County by the religious corporation that had owned and operated the school. To induce the County to purchase Kemper Hall, a nearby landowner, Janet Anderson, also agreed to donate her home and adjoining five acres to the County. The property currently *818 consists of over seventeen acres and contains a number of valuable, historic buildings, including the Anderson Arts Center. We will hereafter refer to the entire physical park premises as Kemper Park.
¶4 On the same day the County acquired Kemper Park, it executed a lease agreement with Kemper Center, Inc.[3] The lease was for a term of twenty-five years to expire on August 24, 2002, with a review of the lease occurring every five years. In 1998, the County and Kemper Center, Inc. renewed the lease for an additional twenty-five years at the urging of Kemper Center, Inc.'s then-president, who advised the County he was having difficulty securing sponsor funds for a conference center without a long-term lease in place.
¶5 Under the lease, Kemper Center, Inc. is to pay the County one dollar annually in rent. In exchange, Kemper Center, Inc. has the right to use Kemper Park as a "special purpose area" dedicated to historic preservation, educational and cultural programs, and individual and group recreational activities. The lease permits Kemper Center, Inc. to retain all fees, rental income, and other revenues generated at Kemper Park, but it also makes Kemper Center, Inc. responsible for "operational and maintenance costs." Other relevant provisions of the lease will be discussed below.
¶6 In 1976, the Internal Revenue Service designated Kemper Center, Inc. a tax-exempt charitable and educational organization. Kemper Park was officially designated as a County park on November 3, 1977. The Kemper Hall building was added to the National Register of Historic Places in 1976 and to the *819 Wisconsin Register of *222 Historic Places in 1989. In March 1982, Kemper Center, Inc. and the Kenosha County Park Commission entered into a management agreement that provided Kemper Center, Inc. with monthly funding for the maintenance of Kemper Park, including expenses for employee salaries, utilities and office expenses. The management agreement was in effect between January and December 1982 and has not been renewed, although the County continues to make annual grants to Kemper Center, Inc. These grants have totaled nearly $3 million since 1978.
¶7 In November 2016, Kenosha County resident Annette Flynn submitted to Kemper Center, Inc.'s president, Gary Vaillancourt, a request for disclosures under the Public Records Law. Flynn's request identified records in a substantial number of categories, including documents regarding Kemper Center, Inc.'s formation and tax-exempt status, employee work records, meeting minutes, records regarding certain events held at Kemper Park in 2016, and all documents pertaining to "the status of Victoria's Catering as [Kemper Center, Inc.'s] 'preferred caterer' or 'in-house preferred caterer.' "[4]
¶8 Kemper Center, Inc. denied Flynn's records request, asserting that it was not a "quasi-governmental corporation" subject to the Public Records Law. See WIS. STAT. § 19.32(1). Flynn then commenced the present action, alleging that Kemper Center, Inc. was subject to the Public Records Law, was the custodian of the records that she had requested, and had violated the law by refusing to furnish those records.
*820 Flynn requested declaratory and mandamus relief, as well as damages, costs and attorney fees.
¶9 The parties filed cross-motions for summary judgment and supporting affidavits. Following a hearing, the circuit court granted summary judgment for Flynn, concluding that there was no genuine issue of material fact and declaring Kemper Center, Inc. is a quasi-governmental corporation subject to the Public Records Law.[5] Kemper Center, Inc. now appeals. Additional relevant facts are included below.
DISCUSSION
¶10 We review a grant of summary judgment de novo. Tews v. NHI, LLC , 2010 WI 137, ¶ 40, 330 Wis.2d 389, 793 N.W.2d 860. The summary judgment methodology is well established. Id. , ¶ 41. We first examine the pleadings to determine whether claims have been stated. Id. If so, we examine the moving party's submissions to determine whether it has made a prima facie case for summary judgment. Id. If a prima facie case for summary judgment exists, we examine the opposing party's affidavits and other proof to determine whether summary judgment is appropriate. Id.
¶11 Summary judgment must be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). "The purpose of the summary judgment procedure is to avoid trials when there is nothing to try." Tews , 330 Wis.2d 389, ¶ 42, 793 N.W.2d 860. In *821 reviewing the parties' submissions, we draw all reasonable inferences in the light most favorable to the party against which summary judgment was granted. See *223 Pum v. Wisconsin Physicians Serv. Ins. Corp. , 2007 WI App 10, ¶ 6, 298 Wis.2d 497, 727 N.W.2d 346 (2006). Whether an inference is reasonable and whether more than one inference may be drawn are questions of law. Id.
¶12 The sole issue in this appeal is whether Kemper Center, Inc. is a "quasi-governmental corporation" within the meaning of the Public Records Law. The Public Records Law's purpose is to provide citizens with the "greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them." WIS. STAT. § 19.31. The law applies to "authorities" having custody of a record, which includes a "quasi-governmental corporation." WIS. STAT. § 19.32(1).
¶13 Determining whether Kemper Center, Inc. is a "quasi-governmental corporation," and therefore an "authority" under the Public Records Law, is a matter of statutory interpretation. See Wisconsin Prof'l Police Ass'n v. Wisconsin Ctys. Ass'n , 2014 WI App 106, ¶ 3, 357 Wis.2d 687, 855 N.W.2d 715. Statutory interpretation is a question of law that we review de novo. Id. We give statutory language its common, ordinary and accepted meaning. State ex rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶ 45, 271 Wis.2d 633, 681 N.W.2d 110. If the meaning of a statute is plain, we ordinarily stop the inquiry. Id.
¶14 The term "quasi-governmental corporation" is not defined in the Public Records Law. However, in 2008, our supreme court "set[ ] forth the circumstances when an entity so resembles a governmental corporation, *822 that it is treated as a quasi-governmental corporation for purposes of open meetings and public records laws." State v. Beaver Dam Area Dev. Corp. , 2008 WI 90, ¶ 7, 312 Wis.2d 84, 752 N.W.2d 295. In short, the court determined that an entity is a quasi-governmental corporation "if, based on the totality of circumstances, it resembles a governmental corporation in function, effect, or status." Id. , ¶ 9.
¶15 Each case involving an alleged quasi-governmental corporation must be decided on the particular facts presented. Id. , ¶ 8. Accordingly, courts must consider a nonexhaustive list of factors (as set forth by the supreme court), with no single factor being outcome determinative. Id. The five factors that guided the court's conclusion that the economic development corporation at issue in Beaver Dam was a quasi-governmental corporation are: (1) whether the entity's funding comes from predominately public or private sources; (2) whether the entity serves a public function; (3) whether the entity appears to the public to be a government entity; (4) the degree to which the entity is subject to government control; and (5) the amount of access governmental bodies have to the entity's records. Id. , ¶ 62. We analyze these factors, as well as other factors we deem relevant, below.
A. Funding source
¶16 A "primary consideration" under the Beaver Dam court's reasoning was that the economic development corporation was funded exclusively by public tax dollars or interest generated on those dollars. Id. , ¶ 10. The court deemed it a "significant factor" that the corporation had cooperative agreements *823 with the City of Beaver Dam that required some combination of annual contributions to the corporation from the city and assignment of a large portion of the room tax the city collected. Id. , ¶ 64. The city also provided the corporation with office space, supplies and clerical support. Id. Thus, the court observed that, like a governmental corporation, the economic development corporation "receives the vast majority of its funds from taxes borne by the public and receives *224 basic support from government sources." Id. , ¶ 65.
¶17 The parties disagree about the extent to which the funding factor militates for or against a conclusion that Kemper Center, Inc. is a quasi-governmental corporation. The basis for their disagreement is clear. Kemper Center, Inc. contends that only the County's direct contributions constitute public funding, while Flynn maintains that all "indirect contributions" that Kemper Center, Inc. generates through its programming and rentals should be attributed to the County. We reject Flynn's argument in this regard.
¶18 To explain, Kemper Center, Inc. concedes it has historically received donations from the County, although the parties agree nothing compels the County to make such grants.[6] Still, County contributions have occurred every year dating back to 1978, in varying *824 amounts. Initially, the County provided a small amount of money, but starting in 1982, it established a regular pattern of contributing between $50,000 and $80,000 to Kemper Center, Inc. annually. After those amounts decreased between 2001 and 2003, starting in 2004 the County has earmarked at least $100,000 to go directly to Kemper Center, Inc. for its operations.[7] In addition, the County has budgeted varying amounts for capital improvements to Kemper Park, including $72,000 for a parking lot and a carriage house in 1989, approximately $360,000 for roof work between 1992 and 1998, and approximately $112,500 to construct a bike path in 2013. Between 2010 and 2016, the County's contribution to Kemper Center, Inc. remained static at $100,000 for operations and $50,000 in capital costs.
¶19 A memorandum of understanding relating to a 1998 restoration project states that the County and Kemper Center, Inc. "agree that the primary objective of this project [is] to establish the Kemper Center as a self[-]sustaining entity." The memorandum continues: "As a self-sustaining entity, the Kemper Center will fund operating costs and routine building maintenance, renovation, and restoration costs through rentals and user fees. The Annual County subsidy shall be phased out as set forth in this memorandum of understanding." The 2001-2003 reductions in the County's contributions to Kemper Center, Inc.'s operations fund *825 occurred pursuant to the memorandum, but it is undisputed that Kemper Center, Inc. has not become self-sufficient.
¶20 Kemper Center, Inc. does not dispute that it has received contributions from the County for operating and capital expenses. Rather, it argues that these contributions were only a small portion of its total budget. Kemper Center, Inc. observes that direct contributions from the County toward its operational costs, as well as County contributions toward capital costs at Kemper Park, amounted to less than 20% of Kemper Center, Inc.'s total *225 income between 2006 and 2016, and no more than 25% of its income during any given year. By way of illustration, in 2008, Kemper Center, Inc.'s total revenue was $1,123,717, which included a $100,000 County contribution to operations and a $150,000 County contribution for capital improvements at Kemper Park. Thus, County contributions amounted to approximately 23% of Kemper Center, Inc.'s total revenue that year, with the remaining 77% of revenue being generated by events, fundraising, grants, contributions, memberships, sales and rentals.[8] In 2010, *826 Kemper Center, Inc. had total revenue of $610,210, including $150,000 in County contributions (approximately 25%). In 2015, Kemper Center, Inc. generated $634,188 in revenue, of which the County directly contributed $150,000 (approximately 24%).[9]
¶21 Flynn does not dispute the amount of the County's direct payments and capital contributions to Kemper Center, Inc. Instead, she argues that in addition to those sums, all of the revenue Kemper Center, Inc. generates from its leasehold interest should be viewed as an "indirect contribution" by the County to Kemper Center, Inc. Flynn appears to reason that these sums should be imputed to the County because the County would receive that revenue if it directly operated Kemper Park. Flynn thus views the revenue Kemper Center, Inc. generates from its use of Kemper Park as akin to a government subsidy or assignment. By this measure, Flynn estimates that County "funding" accounts for between 65% and 87% of Kemper Center, Inc.'s total revenue over each of the last five years.
¶22 We disagree with Flynn that all revenue Kemper Center, Inc. generates from its use of the leased premises should be imputed to the County for purposes of determining the degree of County funding. It is undisputed that Kemper Center, Inc. is the County's *827 tenant. A landlord typically has no claim to the revenue generated by a tenant without a specific provision in the lease. See Brenner v. Amerisure Mut. Ins. Co. , 2017 WI 38, ¶ 48, 374 Wis.2d 578, 893 N.W.2d 193 (observing that a lessee's purpose for entering into a lease is to "obtain possession of that property and to put it to whatever use may be desirable, so long as it conforms to the terms of the tenancy").
¶23 Moreover, Flynn's theory presupposes that if Kemper Center, Inc. was to vacate the premises, the County would have some obligation to assume its duties and operations or, at a minimum, would choose to do so. Neither of these results necessarily follows, either as a matter of logic, law, or from the summary judgment *226 record. Logically, the property is the County's and, as the owner, the County is presumed to have the right to use the property as it wishes should the lease terminate (including shutting Kemper Park down entirely). Legally, Flynn has not presented any evidence demonstrating the County has assumed any obligation to operate Kemper Park upon the termination of Kemper Center, Inc.'s tenancy, or even that it might do so. These threshold considerations compromise Flynn's argument, and we therefore need not consider the effect of any hypothetical obligation-or interest-on the County's part in operating Kemper Park.
¶24 Finally, Flynn's assertion that Kemper Center, Inc.'s revenue effectively belongs to the County ignores the important history and nuance of the relationship between Kemper Center, Inc. and the County. In the end, Flynn's theory appears to turn on the notion that because Kemper Center, Inc. pays only a nominal amount of rent, the County is gifting Kemper Center, Inc. the revenues generated by Kemper Park or subsidizing Kemper Center, Inc. in the same amount. This *828 assertion is untenable given the circumstances that led to the County's ownership of Kemper Park.
¶25 Before 1977, the lands comprising what is now Kemper Park were privately owned and operated (in part each by the school and by Janet Anderson). Then, given the grassroots efforts of Kemper Hall alumnae, the County obtained a significant-and, by all accounts, valuable-piece of shoreline property essentially for free. It is in this context that the County has paid a substantial sum of money over many years to improve the property. However, the County's capital contributions and funding of major improvements to the property are not paid to, or controlled by, Kemper Center, Inc. directly. Rather, the County directs the use of those funds. While there may be an ancillary benefit from those improvements to Kemper Center, Inc. as a tenant, fundamentally these were expenditures by the County to maintain and improve its property-which, again, it obtained without using public funds.[10]
¶26 In addition, it is undisputed that some of the revenue Kemper Center, Inc. itself generates has been directed toward improvements to the County's land. Such improvements are consistent with Kemper Center, Inc.'s mission, and, indeed, the lease makes Kemper Center, Inc. responsible for "the operational and maintenance costs including utilities for the demised *829 premises and all buildings thereon." Although the lease gives Kemper Center, Inc. the right to all revenue generated by its operations on the property, Kemper Center, Inc. is required to use that revenue "first for maintaining and operating the premises and, secondly, for programs, etc." One long-time member of Kemper Center, Inc.'s board of directors averred that Kemper Center, Inc. has "raised many millions of dollars to operate, repair, and maintain the park and its structures from sources other than the County." Attributing to the County all on-site revenue generated by Kemper Center, Inc. ignores the benefit the County receives from the leasing arrangement, whereby Kemper *227 Center, Inc. funds improvements to County property but pays only nominal rent.[11]
¶27 As a result, unlike the economic development corporation in Beaver Dam , Kemper Center, Inc. is not "almost entirely," or even mostly, taxpayer funded. See Beaver Dam , 312 Wis.2d 84, ¶¶ 64-65, 752 N.W.2d 295. According to the appellate record, the vast majority of Kemper Center, Inc.'s revenue is generated from its use of the leased property and other fundraising, not from public coffers. Although the County makes some annual contributions to fund Kemper Center, Inc.'s operations, nothing requires it to do so, and it may *830 cease making such contributions at any time. Unlike in Beaver Dam , there are no significant agreements between the two entities pledging any public funds. See id. , ¶ 64. Similarly, no provision exists in the lease for providing Kemper Center with taxpayer-funded office space, supplies or clerical support. See id. , ¶ 64.
¶28 Flynn also argues that "if the lease ever ends or if Kemper Center ... stops honoring its obligations to the County under the lease, its right to occupy the land will disappear and virtually all its assets will belong to the County." This argument attempts to draw parallels between this case and Beaver Dam , in which the court found that a provision in the economic development corporation's articles of incorporation-whereby the corporation's assets would revert back to the city if it was dissolved or liquidated-strongly suggested that the corporation should be deemed quasi-governmental. See id. , ¶¶ 67-68. Specifically, the articles of incorporation stated that if the corporation was dissolved or liquidated, all of its remaining assets would revert back to the city. See id.
¶29 Flynn's concerns regarding the County's "reversionary" interest in this case are overstated. The lease requires Kemper Center, Inc. to establish a trust fund with a minimum balance of $100,000. The trust corpus is to be used to establish an endowment; the lease directs that income earned from the principal "will be used for operating and maintaining the demised premises." The lease provision regarding termination provides Kemper Center, Inc. with a safe harbor of sixty days within which to correct any "substantial non-compliance" with the lease terms. After that sixty-day period, if the violation remains uncorrected, the County may terminate the lease with sixty days' notice, in which case "any funds, accounts, or trusts being held *831 by the Lessee which have been designated to be used for the maintenance and operation of the demised premises shall be conveyed to the [County] for the purpose of defraying maintenance and operational costs."
¶30 The provisions in Kemper Center, Inc.'s lease are materially different from the language the court found persuasive in Beaver Dam . In that case, the economic development corporation's assets (which, again, came entirely from the public treasury) reverted to the city upon the corporation's dissolution. Id. , ¶ 67. Here, the County's ability to access Kemper Center, Inc.'s funds triggers only upon a substantial violation of the lease terms that *228 continues uncured for more than sixty days. Even then, the County does not have the capability to reach all of Kemper Center, Inc.'s assets. Only those funds earmarked for the "maintenance and operation of the demised premises" are subject to forfeiture.[12] Under Kemper Center, Inc.'s articles of incorporation, upon dissolution, any remaining assets are distributed to other charitable, educational or scientific organizations. Meanwhile, Kemper Center, Inc.'s surrendering its right to use Kemper Park to the County is typical of that found in any termination of a landlord-tenant relationship. *832 ¶31 In sum, we conclude the "source of funding" factor, and attendant factors unique to this case, weigh against a conclusion that Kemper Center, Inc. is a quasi-governmental entity. Although Kemper Center, Inc. receives County contributions for its operations and to fund capital improvements to Kemper Park, such amounts represent only a minority portion of Kemper Center, Inc.'s overall funding structure. We also reject Flynn's assertion that all revenue generated by Kemper Center, Inc.'s use of Kemper Park should be treated as a County contribution, as well as her reliance on the supposed "reversionary" interest the County holds in Kemper Center, Inc.'s funds pursuant to the lease's terms. Kemper Center, Inc.'s funding composition more closely resembles that of a private, nonprofit entity than a governmental corporation.
B. Public function
¶32 In Beaver Dam , the supreme court observed that the economic development corporation at issue resembled a governmental corporation with respect to its functions. Id. , ¶ 69. The corporation promoted economic development and business retention within the city limits and surrounding areas, functions that were historically governmental in nature. Id. Indeed, the corporation's functions were "indistinguishable" from the city's former economic development office, and its former director was the corporation's executive vice president. Id. The corporation had no clients other than the City of Beaver Dam, for which it acted as an agent in negotiating development agreements with companies. Id. , ¶¶ 69-70. In short, the court concluded the corporation did not appear to have any purely private function. Id. , ¶ 72.
*833 ¶33 Kemper Center, Inc. maintains that it does not perform functions that are governmental in nature. Kemper Center, Inc. admits that its mission and operations-which, again, are preserving Kemper Park, providing recreational and educational activities for the public, and offering programming that promotes local history and the arts-provide a public benefit, but it contends that public benefit alone does not establish a governmental function as distinguished from a private function. In this regard, Kemper Center, Inc. cogently argues that "[m]aintaining and operating a cultural center within historically significant buildings is not a function that is exclusively governmental or that is even commonly associated with government." Indeed, these functions also serve the private purposes of the very *229 Kemper alumnae who wanted to see the site of their alma mater preserved through the 1977 transaction with the County. Kemper Center, Inc. equates itself to other nonprofit corporations that operate historical sites and museums-functions it claims are not typically performed by the government. See 73 Wis. Op. Att'y Gen. 53 (1984) (concluding that a corporation created to manage the Circus World Museum at Baraboo by individuals associated with the Board of Curators of the State Historical Society of Wisconsin was not a quasi-governmental corporation under the Wisconsin Open Meetings Law).[13]
¶34 Flynn, meanwhile, asserts Kemper Center, Inc.'s functions are "indistinguishable" from the functions of publicly operated parks. She acknowledges that Kemper Center, Inc. provides the same services as any number of privately owned entities (including golf *834 courses, restaurants, concert halls, and museums), but Flynn also argues these services are the "traditional public functions of a governmental body." Flynn argues Kemper Center, Inc. was formed for the "express purpose of relieving the County of the burden of performing those functions in this particular park."
¶35 While we question the merit of many of Flynn's arguments, we conclude the "public purpose" factor in this case does not strongly support a conclusion in any fashion regarding whether Kemper Center, Inc. is a quasi-governmental corporation. As both parties acknowledge, what Kemper Center, Inc. does is not uniquely governmental in nature. Both public and private actors have an interest in preserving historical properties, providing recreational and educational programming and opportunities, and promoting local culture. None of those activities lies exclusively, or even predominately, in either the public or private sphere. Further, as explained below, infra ¶ 48, it is undisputed that Kemper Center, Inc. decides how the broadly stated functions intrinsic to its mission are accomplished on an operational, day-to-day level. Under these circumstances, it cannot be said that Kemper Center, Inc.'s functions tilt heavily in either direction.
C. Appearance of governmental nature
¶36 Our supreme court found it instructive that the economic development corporation in Beaver Dam "resemble[d] that of a governmental corporation from the perspective of the public." Id. , ¶ 73. When it is difficult for the public to discern where the municipality ends and the corporation begins, it can be more appropriate to categorize the corporation as quasi-governmental *835 in nature for purposes of the Public Records Law. Id. The Beaver Dam court concluded the corporation resembled a governmental corporation to the public because its officers were located in a municipal building, two of the corporation's twelve directors were city officials, and the corporation's website was included within the city's website. Id. , ¶¶ 16, 73.
¶37 The circuit court's analysis of this issue appears to have been limited to the fact that the "Kenosha County Parks 2017 Activity Guide" identifies "Kemper Center" as one of many County parks. Aside from the 2017 Activity Guide, Flynn also argues numerous other documents published by the County suggest to the public that Kemper Center, Inc. is a governmental corporation. First, Flynn observes that "Kemper Center" is identified by name on a map of County parks located on the County's official website. Additionally, Flynn finds it significant that the County *230 website includes a description of Kemper Center and the Anderson Arts Center,[14] as well as a link to Kemper Center, Inc.'s website, its phone number, its street address, and a map showing Kemper Park's location in the County. *836 ¶38 Flynn also argues that several County planning documents evidence to the public that Kemper Center, Inc. is a governmental arm. A document entitled "Kenosha County Park and Open Space Plan: 2035," which is available on the County's website, identifies "Kemper Center" as a "park and outdoor recreation site[ ] owned by Kenosha County." Under the recommended plan, the County would continue to maintain that site and provide additional facilities as needed. Another publicly available, long-term planning document lists "Kemper Center" as a park, outdoor recreation, and open space site owned by the County. That document refers to Kemper Center variously as a "cultural and civic institution," a "Kenosha County facility," and a "government and institutional building" in Kenosha County.[15] It also states that "Kenosha County operates the Durkee Mansion and Anderson Arts Center, both located on the grounds of the Kemper Center."
¶39 We disagree that these publicly available materials sufficiently suggest to members of the public that Kemper Center, Inc. is a governmental corporation. Most of the documents are accurate in stating "Kemper Center" is a County-owned park or facility. Flynn's argument fails to account for the fact that Kemper Center is both the name of the park owned by the County and the name of the nonprofit entity *837 operating the County park under the terms of the lease.[16] Thus, the fact that certain maps and documents refer to "Kemper Center" as a County park is less suggestive of the nonprofit corporation being an arm of the County than if the corporation and the park did not share the same name. In addition, the County's providing Kemper Center, Inc.'s contact information on its website is consistent with the separate treatment of the County and the corporation, insomuch as the County is directing people away from itself and to Kemper Center, Inc. for inquiries regarding the facilities at Kemper Park. Finally, unlike the economic development corporation in Beaver Dam , here Kemper Center, Inc. maintains its own website independent of the County's.
¶40 Kemper Center, Inc. acknowledges that one of the planning documents mistakenly states that the County "operates" facilities located at Kemper Park. However, we agree with Kemper Center, Inc.'s *231 assertion that this isolated passage, buried in what appears to be a several-hundred page report for which the County did not have sole authorship,[17] is insufficient, as a matter of law, to transform Kemper Center, Inc. into a quasi-governmental corporation based on public perception. This is particularly so when the totality of the circumstances would otherwise suggest to the *838 public that the County and Kemper Center, Inc. are separate entities, even though both are affiliated with Kemper Park.
¶41 Flynn also argues the public would view Kemper Center, Inc. as being synonymous with the government because it is "included by name as a County Park in the publicly available ordinances of Kenosha County governing the County's parks." Among other things, the ordinances give the director of Kemper Center, Inc. authority to determine the information required in permit applications for use of the premises, to waive the usage fees established by Kemper Center, Inc., to determine whether each application should be granted, and to revoke an issued permit upon good cause. See KENOSHA COUNTY, WIS., MUNICIPAL ORDINANCES § 10.05 (2016). The ordinances also exempt Kemper Center, Inc. from the general prohibition of the sale and possession of alcohol in County parks, require Kemper Center, Inc. to comply with the terms of an annual permit issued by the County, and make it lawful for Kemper Center, Inc. to allow consumption of alcohol at Kemper Center Park. See KENOSHA COUNTY, WIS., MUNICIPAL ORDINANCES § 10.07(7) (2016).
¶42 Again, the County ordinances do not persuade us that a member of the public would view Kemper Center, Inc. as a governmental corporation. Flynn continues the same error as before in suggesting that the ordinances' merely naming "Kemper Center" as a County park is sufficient to tilt this factor in her favor. Beyond that failing, the ordinances, in their totality, plainly suggest to a reasonable reader that Kemper Center, Inc. is a different entity than the County, albeit one that shares some jurisdiction and a business relationship with County departments over Kemper Park. Under the circumstances here, some *839 shared authority between the County and its tenant is to be expected, but that relationship neither creates a public perception that Kemper Center, Inc., a tenant, is part of the government nor necessarily transforms that tenant into a "quasi-governmental entity."
D. Government control
¶43 The parties also dispute the degree of the County's control over Kemper Center, Inc. In Beaver Dam , the supreme court concluded the composition of the economic development corporation's board of directors "evinces some degree of City control." Beaver Dam , 312 Wis.2d 84, ¶¶ 75-76, 752 N.W.2d 295. The court noted that while the majority of the corporation's twelve voting directors were private citizens, two city officials served as ex officio voting members of the board. Id. , ¶¶ 16-17, 75-76. Although the court did not articulate the weight it gave this factor, it apparently concluded that the presence of these city officials on the board of directors supplied an unspecified degree of governmental control over the corporation. See id. , ¶ 76.
¶44 Here, Flynn asserts that the County's controlling role is similar to the city's in Beaver Dam because one member of the Kenosha County Board of Supervisors has served on Kemper Center, Inc.'s nineteen-member *232 board of directors since 2010. In addition, the director of the Kenosha County Parks sits as a member of the Kemper Center, Inc. seven-member buildings and grounds committee. Under Beaver Dam , these facts suggest "some degree" of County control over Kemper Center, Inc. See id. , ¶ 76.
¶45 However, the inference of County control is much weaker here than the inference of city control in Beaver Dam . In that case, the economic development *840 corporation's board of directors consisted of twelve voting members, two of which were required by the corporation's bylaws to be filled by the city's mayor and the chairperson of the city's community development committee. Id. , ¶ 16. Here, there is no indication in the appellate record that the sole County-associated member of Kemper Center, Inc.'s board of directors serves in that capacity as a member of the County Board of Supervisors, as opposed to a private citizen. See id. Moreover, Kemper Center, Inc.'s board of directors consists of nineteen individuals, creating a more diluted pool of authority than the court considered in Beaver Dam .[18] Finally, the presence of the County parks director on Kemper Center, Inc.'s seven-member buildings and grounds committee is less indicative of County control than the circumstances in Beaver Dam . This is so both because the committee does not exercise general jurisdiction over the entire corporation and because the director's presence on that committee appears to be a function of the unique landlord-tenant relationship present in this case.
¶46 Indeed, the central indicia of County "control" advanced by Flynn are merely indicative of a typical landlord-tenant relationship. Under the lease, the Kenosha County Highway and Park Committee (the "Committee") is to "serve as the liaison" between Kemper Center, Inc. and the County. The lease obligates Kemper Center, Inc. to meet at the request of the Committee or the Kenosha County Board of Supervisors. Kemper Center, Inc. must permit the County to have access to Kemper Park "at any time upon request *841 for purposes of inspection or repairs." The lease sets forth generally what Kemper Park can be used for (preservation, educational and cultural programming, and public recreation), and it requires Kemper Center, Inc. to "keep and maintain the grounds and outdoor recreational facilities safe for public use in accordance with County Park standards."
¶47 Consistent with a landlord-tenant relationship, the lease permits Kemper Center, Inc. to make nonstructural repairs or alterations to buildings in accordance with the County's master plan and the building's "historic integrity." Any improvements Kemper Center, Inc. makes remain the County's property upon termination of the lease. The County, as owner of Kemper Park, must consent to any proposed structural changes. Kemper Center, Inc. has not made any structural alterations to buildings on the Kemper property without the County's permission, even if those alterations were funded from sources other than the County.[19]
*233 *842 ¶48 Under the lease, Kemper Center, Inc. has full responsibility for program development and the day-to-day operations of Kemper Park. There is no evidence in the appellate record that the roughly twenty Kemper Center, Inc. employees are County employees, nor is there any evidence that the County has any control over Kemper Center, Inc.'s staff, which also includes approximately two hundred volunteers. There is no evidence the County directs Kemper Center, Inc.'s fundraising efforts, operations, management decisions, or activities in accomplishing its mission. In sum, while we accept under Beaver Dam that the County here exercises "some control" over Kemper Center, Inc. because a County official sits on the board of directors, the appellate record shows that the degree of that control, including over how Kemper Center, Inc. performs most of its activities, is negligible. We find this lack of control by the County over Kemper Center, Inc.'s principal functions particularly compelling to our assessment of the Beaver Dam factors.
E. Government access to records
¶49 The "degree of access" a governmental body has to a corporation's information is also instructive in *843 determining whether that corporation is quasi-governmental in nature. Beaver Dam , 312 Wis.2d 84, ¶ 77, 752 N.W.2d 295. In Beaver Dam , for example, the cooperative agreements between the city and the economic development corporation permitted city representatives to examine the corporation's accounting records and obligated the corporation to submit an annual management plan to the city. Id.
¶50 Here, this factor favors Flynn's position. Although the lease does not require Kemper Center, Inc. to create or maintain any particular documents, it does obligate Kemper Center, Inc. to "make available to Kenosha County or its agent all books, accounts, records and documents as kept by [Kemper Center, Inc.] pertaining to the demised premises." While the right of access purports to be limited by the "pertaining to the demised premises" clause, the limited scope of Kemper Center, Inc.'s activities and mission suggests that most, if not all, of its records would be available to the County under this lease provision.
CONCLUSION
¶51 Based on the totality of the circumstances in this case, we conclude Kemper Center, Inc. does not resemble a governmental corporation in "function, effect, or status." See Beaver Dam , 312 Wis.2d 84, ¶ 9, 752 N.W.2d 295. Kemper Center, Inc. was not formed by the County but, rather, it arose out of the grassroots efforts of Kemper Hall alumnae who were *234 concerned for the preservation of the property. The County received ownership of the property essentially for free by virtue of Kemper Center, Inc.'s fundraising efforts. The County then dedicated the property as a park. It *844 subsequently entered into a lease arrangement that allowed Kemper Center, Inc. to use Kemper Park for nominal rent in exchange for Kemper Center, Inc.'s promise to direct its resources toward the upkeep and preservation of the property.
¶52 These and all the other circumstances discussed throughout this opinion, including the factors articulated by the Beaver Dam court, lead us to the conclusion that Kemper Center, Inc. is not an "authority" under the Public Records Law. Under the circumstances here, the revenue generated by Kemper Center, Inc.'s use of Kemper Park is not properly treated as a "subsidy" by the County, and therefore the bulk of Kemper Center, Inc.'s funding comes from non-County sources. Kemper Center, Inc.'s functions are not clearly public or private in nature. Rather, its purposes are commonly achieved by both public and private entities. Kemper Center, Inc. does not appear to the public to be an arm of County government, nor does the County wield any significant degree of control over Kemper Center, Inc.'s operations. Although Kemper Center, Inc. is required to make its books and records available to the County, on balance the application of the Beaver Dam factors compels the conclusion that Kemper Center, Inc. is not a quasi-governmental corporation.
¶53 Flynn's concluding argument is one of policy-that "[m]illions of taxpayer dollars" should not be "insulated from public scrutiny by simply filtering them through a private entity." This is an overstatement. First, we note that the County is undisputedly an "authority" under the Public Records Law. Documents relating to County expenditures can presumably be obtained from the County itself, and citizens can hold elected officials accountable at the ballot box for their spending decisions. To the extent the County *845 maintains records regarding either Kemper Center or Kemper Center, Inc., such records presumably may be obtained through the Public Records Law from the County. Second, the narrow issue presented in this case is whether Kemper Center, Inc. is a quasi-governmental corporation. Flynn has not argued-nor presented any legal authority for-the proposition that mere payments to an entity from a governmental source transform the recipient into such a corporation. Meanwhile, arguments regarding public policy and which outcome best serves the legislative purposes of the Public Records Law largely-if not merely-beg the very issue presented in this case of whether Kemper Center, Inc. is a quasi-governmental corporation.
¶54 Based upon the application of the Beaver Dam factors, we conclude Kemper Center, Inc. was entitled to summary judgment as a matter of law. We therefore reverse the judgment and remand with directions for the circuit court to dismiss the complaint.
By the Court. -Judgment reversed and cause remanded with directions.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The specific language used in Kemper Center, Inc.'s articles of incorporation was as follows:
Article 3. The purposes shall be:
1. To raise funds and contribute the same to the City of Kenosha, Wisconsin, or County of Kenosha, Wisconsin, for the following:
A. Purchase by said City or County of real estate abutting Lake Michigan [known as Kemper Hall],
B. Maintenance of said Kemper property and any additions thereto, should the same be purchased by said City or County;
It is the purpose of this corporation to relieve said City or County of a portion of the cost of purchase and maintenance of said Kemper property and thus encourage its purchase, preservation and use as a park, recreational area, cultural center or other such use open to and for the benefit and enjoyment of the general public.
2. To raise funds for and by other means to encourage and promote the development of a cultural center at and on said Kemper property and any additions thereto, said cultural center to be open to and for the benefit and enjoyment of the general public.

The lease was originally executed in 1977, and an addendum was added in 1981. It was then renewed in 1992. All lease provisions referenced in this opinion are from the 1992 version of the lease, which remains in effect at this time.

Although the record is somewhat unclear and the requester's motive is irrelevant to our analysis, it appears Flynn owns a catering business serving Kenosha County.

The parties stipulated, and the circuit court ordered, that the decision would be stayed pending appeal.

The lease states that the County "may provide funding for maintenance, improvements and direct operational costs of Kemper Center as a County Park. The terms of such funding will be defined by a separate management agreement between [Kemper Center, Inc.] and the [County]." (Emphasis added.) At best for Flynn, the evidence shows that the County was obligated by the 1982 management agreement to make monthly contributions to Kemper Center, Inc. for the "maintenance" of the property, including salaries, utilities and office expenses. However, that agreement was in effect only one year, and Flynn does not argue there is any other document that has required the County to make any payment to Kemper Center, Inc. before or after 1982.

The County did not make any contribution directly to Kemper Center, Inc. in 2003. It did, however, budget $50,000 for capital projects at Kemper Park in that year.

The financial data included in this paragraph is derived from Exhibit C to the affidavit of Gary Groenke, a long-time member of Kemper Center, Inc.'s board of directors. Other exhibits in the appellate record, which include tax filings and spreadsheets prepared by both the County and Kemper Center, Inc., use slightly different dollar figures for revenue and expenses in any particular year. Although the annual revenue amounts vary somewhat depending on which document is consulted, the total amount of the County's annual contribution is undisputed, as is the approximate amount of revenue Kemper Center, Inc. earned each year. Any variations amongst the record documents with respect to the specific amounts of Kemper Center, Inc.'s annual revenue do not preclude summary judgment, nor has Flynn argued as much. Indeed, as Flynn concedes in her response brief, the real battle is over how the parties "characterize[ ] those revenues."

For purposes of illustrating Kemper Center, Inc.'s financial relationship with the County in this and prior paragraphs, we have included the amounts the County designated for capital improvements to Kemper Park as "contributions" to Kemper Center, Inc. However, as we later explain, those amounts are properly viewed as funds the County expends to maintain its own property. See infra ¶ 25.

Although we raise these points regarding the history and nuance of the relationship between Kemper Center, Inc. and the County in the context of discussing the funding source factor articulated in State v. Beaver Dam Area Development Corp. , 2008 WI 90, 312 Wis.2d 84, 752 N.W.2d 295, we note this history is itself an additional, independent factor bearing on whether Kemper Center, Inc. is a quasi-governmental corporation. See id. , ¶ 63 n.14 (noting the factors listed are not exclusive in determining whether entities are subject to the Public Records Law).

In this vein, we note the lease even absolves the County from maintaining the property as a County park. The lease obligates Kemper Center, Inc. to "keep and maintain the grounds and outdoor recreational facilities safe for public use in accordance with County Park standards," as well as to clear snow, ice and debris from the sidewalks and parking areas, and to preserve trees and landscaping. Additionally, Kemper Center, Inc. is obligated to buy liability insurance for the property that includes Kenosha County as an additional insured. These are significant benefits to the County that are not reflected in Flynn's analysis of the funding issue.

Although Flynn makes the blanket assertion that "virtually" all of Kemper Center, Inc.'s funds will be subject to forfeiture under the lease, she fails to develop any argument on these grounds based upon the specific terms of the lease. Specifically, Flynn fails to demonstrate that all of Kemper Center, Inc.'s income (including not only revenue generated by its use of Kemper Park, but also revenue it generates by fundraising, for example) is required to be used for maintenance and operations. We will not abandon our neutrality to develop arguments for a party. Industrial Risk Insurers v. American Eng'g Testing, Inc. , 2009 WI App 62, ¶ 25, 318 Wis.2d 148, 769 N.W.2d 82.

"Opinions of the attorney general are not binding as precedent, but they may be persuasive as to the meaning of statutes." Beaver Dam , 312 Wis.2d 84, ¶ 37, 752 N.W.2d 295.

The appellate record contains a printout of the County's website relative to Kemper Center, in which the property is described as follows:
Kemper Center and the Anderson Arts Center is a cultural and recreational facility along the shores of Lake Michigan. The 15-acre property is home to picturesque historic landmarks (circa 1800), floral landscaping, along with a beautiful scenic setting overlooking Lake Michigan. Frequently the site of lawn concerts, art exhibits, retreats and weddings, the Center also offers picnic tables and a soccer field in its open space between the two landmarks.

The appellate record contains only a few pages excerpted from the document entitled "A Multi-Jurisdictional Comprehensive Plan for Kenosha County: 2035." There appears to be a footnote that provides further information regarding Kemper Center's inclusion on the list of governmental and institutional buildings, but the page on which that footnote is located is not present in the record.

In this respect, it is important to note that the documents and web pages on which Flynn relies refer to "Kemper Center" generally, as opposed to using the proper name of the entity operating those premises, "Kemper Center, Inc."

The document, "A Multi-Jurisdictional Comprehensive Plan for Kenosha County: 2035," states it was prepared by the Southeastern Wisconsin Regional Planning Commission and the Kenosha County Department of Planning and Development.

There is no indication from the appellate record that any of the County-associated individuals wield any more authority than their individual votes in the relevant Kemper Center, Inc. bodies.

As to alterations and repairs to Kemper Park, the lease states:
[Kemper Center, Inc.] agrees that any alterations it desires to make and all repairs to the interior or exterior of the structures located on said demised premises shall be made at its own cost and expense excepting that such alterations or repairs if made by [Kemper Center, Inc.], shall not in any way affect the structural fitness of the building, and are done and performed in accordance with the requirements of the building inspection ordinances of the City of Kenosha. All such alterations, improvements, and repairs and fixtures shall remain upon the demised premises at the time of the termination of this lease, and shall be and remain the property of the [County].
The lease also requires that any alterations, improvements, or similar changes made by either party "shall respect the historic integrity of the demised premises" and are to comport with the County's master plan and National Register of Historic Places' guidelines.
With respect to structural changes, the lease gives the County the right to approve any such proposals by Kemper Center, Inc. Again, structural changes are to "respect the historical integrity of the buildings" and must comport with the County's master plan for Kemper Park. Kemper Center, Inc. does not have the right to construct new buildings without the County's approval. While the lease does give Kemper Center, Inc. the right to raze or demolish buildings at its own expense, the County retains the right to veto any such action.